CUBBINS *v.* MISSISSIPPI RIVER COMMISSION.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF MISSISSIPPI.

No. 299.   Argued April 24, 1916.—Decided June 5, 1916.

*Quære*, Whether a suit against the members of the Mississippi River Commission to enjoin them from constructing levees is not really a suit against the United States of which the courts have no jurisdiction without its consent.

An owner of land fronting on the Mississippi River has no right to

complain of the overflow of his land caused by the building of levees along the banks of the river for the purpose of confining the water in times of flood within the river and preventing it from spreading out from the river into and over the alluvial valley through which the river flows to its destination, although keeping the water within the river is to so increase its volume as to raise its level and cause the overflow complained of.

The general right to an unrestrained flow of rivers and streams and the duty not to unduly deflect or change the same by works constructed for individual benefit, qualified by a limitation as to accidental and extraordinary floods, prevail under the Roman Law and also exist in England, and, notwithstanding some contrariety and confusion in adjudged cases, also in this country.

The overflows of the Mississippi River, which the levees objected to by the complainant are designed to prevent, are accidental and extraordinary, and justify the construction of the levees for the purpose of preventing destruction to the valley of the river.

The conditions existing in the valley of the river demonstrate that the work of the Mississippi River Commission, and of the various state commissions, in constructing the series of levees from Cairo to the Gulf is for the purpose of prevention of destruction and improvement of navigation by confining the river to its bed and is not for purposes of reclamation.

Congress had power to create the Mississippi River Commission and through it to build levees to improve the navigation of the Mississippi River, and the Government does not become responsible to riparian owners for the deflection of water by reason of such levees.

The rights of riparian owners on opposite sides of a stream embrace the authority of both, without giving rise to legal injury to the other, to protect themselves from the harm resulting from 'the accidental or extraordinary floods, such as occur in the Mississippi River, by building levees if they so desire. *Jackson* v. *United States,* 230 U. S. 1.

There is no identity between the great valley of the Mississippi and the flood bed of that river, but the bank of that river is where it is found and does not extend over a vast and imaginary area. *Hughes* v. *United States,* 230 U. S. 24.

THE facts, which involve the rights of riparian owners on the Mississippi River and the power of the Federal and state Governments to construct levees along the same and liability resulting therefrom, are stated in the opinion.

*Mr. Barnette E. Moses* for appellant:

The right of the Levee District, for the reclamation of lands, to construct levees which have the effect of obstructing the natural flow and turning the water upon the lands of an owner on the opposite side of the river, is not a local question; but is one of general law, on which decisions of the state courts are not binding on the Federal courts. *Cairo & Chicago Ry.* v. *Brevoort,* 62 Fed. Rep. 129; *Hollingsworth* v. *Tensas Commissioners,* 17 Fed. Rep. 115.

The construction of works, for the improvement of navigation, is an exercise of the power of eminent domain, and the owner of private property taken for that purpose must be compensated. *United States* v. *Lynah,* 188 U. S. 445; *Armond* v. *Green Bay Co.,* 31 Wisconsin, 316; *King* v. *United States,* 59 Fed. Rep. 9; *Williams* v. *United States,* 104 Fed. Rep. 50; *Carlson* v. *St. Louis River Co.,* 73 Minnesota, 1128; *Velte* v. *United States,* 76 Wisconsin, 278; Desty, Fed. Const. 322.

The construction of levees for reclamation of lands from overflow, although referable in a certain sense to the police power, is likewise an exercise of the power of eminent domain, and the owner of property taken for such purpose must be compensated therefor. *Reelfoot Levee* v. *Dawson,* 97 Tennessee, 172; *Chicot County Levee* v. *Crittenden,* 94 Fed. Rep. 613; *Head* v. *Amoskeag Mfg. Co.,* 113 U. S. 9; *Hughes* v. *Levee Commissioners,* 27 So. Rep. 744; *Ex parte Martin,* 13 Arkansas, 198; *Carlson* v. *St. Francis Levee,* 59 Arkansas, 513. See also *Eldrige* v. *Trezevant,* 160 U. S. 452; *Bass* v. *State,* 43 La. Ann. 494.

An owner of land on one side of a stream has no right to build levees upon his side which will prevent the escape of flood water, in times of ordinary flood, over his side and cast them upon land on the opposite side. Cases *supra* and see also *Rex* v. *Trafford,* 20 Eng. C. L. R. 498; *Paine Lumber Co.* v. *United States,* 55 Fed. Rep. 854; *Woodruff* v. *N. B. G. M. Co.,* 18 Fed. Rep. 782, 797; *Jones* v. *United*

*States,* 48 Wisconsin, 385; *Burwell* v. *Hobson,* 12 Gratt.
322 *O'Connell* v. *E. T. Va. & Ga. R. R.,* 87 Georgia, 246,
261; *Garrish* v. *Clough,* 48 N. H. 9; *Parker* v. *Atchison,* 48
Pac. Rep. 631, 632; *Shane* v. *Kans. City, St. Jos. R. R.,*
71 Missouri, 237; *Gulf R. R.* v. *Clark,* 2 Ind. Ter. 319;
*Barden* v. *Portage,* 79 Wisconsin, 126; *Crawford* v. *Rumbo,*
44 Oh. St. 279; *Sullivan* v. *Dooley,* 31 Tex. Civ. App. 589;
*Byrd* v. *Blessing,* 11 Oh. St. 362; *Myers* v. *St. Louis,* 8
Mo. App. 266; *Menzies* v. *Breadalbane,* 3 Bligh, N. S. 414,
423; *Rix* v. *Johnson,* 5 N. H. 520; *Jones* v. *Soulard,* 24
How. 41; *Adams* v. *Frothingham,* 3 Massachusetts, 352;
*Rex* v. *Yarborough,* 3 B. & C. 91; *Scranton* v. *Brown,* 4
B. & C. 485; Gould on Waters, § 209.

For what constitutes a "taking" of property see *Pum-
pelly* v. *Green Bay Co.,* 13 Wall. 166; *United States* v.
*Lynah,* 188 U. S. 445; *Boston & R. M. Co.* v. *Norman,* 12
Pick. 467; *Hooker* v. *N. H. & M. Co.,* 14 Connecticut, 146,
160; *King* v. *United States,* 59 Fed. Rep. 9; *Lowndes* v.
*United States,* 105 Fed. Rep. 836; *United States* v. *Great
Falls Mfg. Co.,* 112 U. S. 645; *High Bridge Lumber Co.* v.
*United States,* 69 Fed. Rep. 326; *Paine Lumber Co.* v.
*United States,* 55 Fed. Rep. 854; *Jones* v. *United States,*
48 Wisconsin, 385; *Velte* v. *United States,* 76 Wisconsin,
278; *United States* v. *Welch,* 217 U. S. 333; *Grizzard* v.
*United States,* 219 U. S. 180; *United States* v. *Sewell,* 217
U. S. 601; *Monongahela Nav. Co.* v. *United States,* 148
U. S. 312, 336; *Scranton* v. *Wheeler,* 179 U. S. 141, 153;
*United States* v. *Chandler-Dunbar Water Power Co.,* 229
U. S. 70; *Jackson* v. *United States,* 234 U. S. 115; *C., B. &
Q. R. R.* v. *Illinois Drainage Commrs.,* 200 U. S. 593;
*McKenzie* v. *Miss. & R. Boom Co.,* 29 Minnesota, 288;
*Manigault* v. *Spring,* 199 U. S. 485; *Bierer* v. *Hurst,* 155
Pa. St. 523; 26 Atl. Rep. 742.

The term, natural conditions, is applicable to and
should be considered in connection with the ordinary
high water stage of the river, as well as the low water

stage thereof, in determining the questions in the cases at bar. *Burwell* v. *Hobson,* 12 Gratt. 322; *S. C.,* 65 Am. Dec. 247; Angell, Water Courses, § 333; *Rex* v. *Trafford,* 20 Eng. C. L. 726; *Cairo, V. & C. R. R.* v. *Brevoort,* 62 Fed. Rep. 129.

Those who were the first to disturb natural conditions, by building a levee cannot recover when a levee was built by others on the opposite bank, even though the Jackson levee and land were thereby destroyed. *Avery* v. *Empire Co.,* 82 N. Y. 582; *Menzies* v. *Breadalbane,* 3 Bligh, N. S. 421; *Wilhelm* v. *Burleyson,* 106 N. Car. 381; *Davis* v. *Munro,* 66 Michigan, 485; *Harding* v. *Whitney,* 40 Indiana, 379; Am. & Eng. Enc. of Law, Vol. XXX, 2d ed., page 387.

The term consequential damages has been used in applying the comprehensive rule stated by counsel, to designate injuries which, in fact, did not amount to a "material impairment" of the value of land. *Gibson* v. *United States,* 166 U. S. 269; *Transportation Co.* v. *Chicago,* 99 U. S. 635.

The permanency of the injury has been expressly treated as one of the determining factors in considering this question. *Hollingsworth* v. *Tensas Comms.,* 17 Fed. Rep. 115; *Cumberland Co.* v. *Hitchings,* 55 Maine, 140; *Bedford* v. *United States,* 192 U. S. 225.

As a matter of law, injuries resulting from work done by the Government, for which immunity from liability was claimed, regardless of the facts as to proximate cause, or the nature of the injury, has been expressly repudiated by this court. *United States* v. *Lynah, supra; Monongahela Nav. Co.* v. *United States, supra; Scranton* v. *Wheeler, supra.*

Intervention of natural forces, as the direct causes of the injuries, made those injuries remote or consequential, in so far as the work of the Government was concerned and there was, therefore, no liability on its part. *Barnes* v.

*Marshall*, 10 Pac. Rep. 115; *Bedford* v. *United States*, 192 U. S. 225; *Gulf, C. & C. Ry.* v. *Clarke*, 101 Fed. Rep. 678.

No provision for compensation is made by the state acts for the land of appellant; and such provision is an indispensable requisite to their constitutionality. *Sweet* v. *Rechel*, 159 U. S. 380; *Head* v. *Amoskeag Mfg. Co.*, 113 U. S. 9; *Adirondack R. R.* v. *New York*, 176 U. S. 335; *Cherokee Nation* v. *So. Kans. Ry.*, 135 U. S. 541; *Benedict* v. *City*, 39 C. C. A. 290; *Gardner* v. *Newburgh*, 2 Johns. Ch. (N. Y.) 162; *Ex parte Martin*, 13 Arkansas, 198; *Bloodgood* v. *M. & H. Ry.*, 18 Wend. (N. Y.) 9; *Meriwether* v. *St. Francis Levee*, 91 C. C. A. 285.

Compensation must be paid before the property is taken or within a reasonable time thereafter.

The constitutional provision requiring compensation is merely declaratory of the common law, and the right to compensation was recognized before the Constitution. *Staton* v. *N. & C. R.*, 17 L. R. A. 839; *Gardner* v. *Newburgh*, *supra*; *Withers* v. *Buckley*, 20 How. 84; *Kaukena &c. Ry.* v. *Canal Co.*, 142 U. S. 254; *Sinnickson* v. *Johnson*, 17 N. J. L. 129.

Taking private property without compensation is a deprivation thereof without due process of law. Cooley, Const. Lim., p. 357; *Muhlker* v. *New York & H. R. R. R.*, 197 U. S. 544; *Pumpelly* v. *Green Bay & M. Co.*, *supra*; *Scott* v. *Toledo*, 39 Fed. Rep. 385.

Under such conditions the Statute of Limitations does not begin to run until the injury has been consummated. *King* v. *United States*, 59 Fed. Rep. 9; Rev. Stat., § 1069; *Sloggy* v. *Dilworth*, 8 A. S. R. 658; *Del. & Rariton Land* v. *Wright*, 21 N. J. L. 469; Gould on Waters, §§ 412, 414.

Appellant has not been guilty of such laches that a court of equity would deny him relief on that ground. *United States* v. *Great Falls Mfg. Co.*, 112 U. S. 645; *Harlow* v. *C. & W. Canal*, 18 Oh. St. 179; *New York* v. *Pine*, 185 U. S. 93, 97.

Appellant had no knowledge or reason to believe that the injury would occur, in the case at bar, until it actually happened and this suit was filed within one year thereafter.

There can be no legislation by estoppel. Estoppel cannot give validity to void acts. *Ottawa* v. *Perkins,* 94 U. S. 267; *O'Brien* v. *Wheelock,* 184 U. S. 489.

Equity will enjoin a trespass or nuisance, such as is alleged, where the injury is irreparable and the remedy at law is inadequate, without regard to the solvency of the wrongdoer.

Various contingencies may arise in particular cases, to render the injury irreparable and the remedy at law inadequate.

The injury may be destructive of the very substance of the estate. It may not be susceptible of estimation in terms of money.

It may be vexatiously repeated or continuous, necessitating a multiplicity of suits.

The suit is not a suit against the State, within the meaning of the Eleventh Amendment. *Osborn* v. *Bank,* 9 Wheat. 738; *Hopkins* v. *Clemson College,* 221 U. S. 646; *Smyth* v. *Ames,* 169 U. S. 466.

Public policy, though favoring the construction of levees for the purposes of the appellees, is not opposed to the compensation of appellants for the taking of his property as a direct and proximate result of such improvements.

Public policy is determined, primarily, by the Constitution. *Vidal* v. *Girard,* 2 How. 127; *Missouri* v. *Illinois,* 180 U. S. 208.

*Mr. Gerald FitzGerald* for Yazoo-Mississippi Delta Levee Board, appellee.

*The Solicitor General,* with whom *Mr. Robert Szold* was on the brief, for Mississippi River Commission, appellee:

Complainant's bill is altogether lacking in equity.

If plaintiff is entitled to any relief his remedy at law is adequate. *United States* v. *Lynah,* 188 U. S. 445.

The suit is brought against the United States without its consent. *Louisiana* v. *McAdoo,* 234 U. S. 627.

The great public interests involved require denial of the injunction. *Beasley* v. *Tex. & Pac. Ry.,* 191 U. S. 492, 497, 498.

Complainant is entitled to no recovery at law, because his damages are remote and consequential. The authorities are conclusive. *Bedford* v. *United States,* 192 U. S. 217; *Jackson* v. *United States,* 230 U. S. 1; *Hughes* v. *United States,* 230 U. S. 24.

In support of the contentions of the Government, see also *Crozier* v. *Krupp,* 224 U. S. 290; *Gibson* v. *United States,* 166 U. S. 269; *Greenleaf Lumber Co.* v. *Garrison,* 237 U. S. 251; *Manigault* v. *Springs,* 199 U. S. 473; *New York* v. *Pine,* 185 U. S. 93; *Scranton* v. *Wheeler,* 179 U. S. 141; *Transportation Co.* v. *Chicago,* 99 U. S. 635; *Williams* v. *Parker,* 188 U. S. 491; *Willink* v. *United States,* 240 U. S. 572.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

The conditions out of which this controversy arises are substantially the same as those which we relied upon in *Jackson* v. *United States,* 230 U. S. 1. We therefore here make a briefer statement of the topography of the country with which the case is concerned and of the other general conditions involved than we would do if such were not the case, since if a fuller statement as to any particular aspect is desired, it can be readily found by a reference to the report of that case.

The complainant as the owner of a piece of land on the east bank of the Mississippi River adjacent to Memphis,

Tennessee, on his own behalf and on behalf of others owning similar land in the same locality, commenced this suit against the Mississippi River Commission and fifteen local State Levee Boards operating on the river between Cape Girardeau, Missouri, and the mouth of the river at the Gulf of Mexico, three of these boards being organized under the laws of Missouri, four under the law of Arkansas, one under that of Tennessee, one under the law of Mississippi and six under the law of Louisiana.

It was alleged that in flood seasons when the water in the Mississippi River rose above its natural low water banks, such water would flow out and over the vast basins in which the alluvial valley between Cape Girardeau and the gulf formed itself and would then either by percolation gradually flow back into the river or be carried over and through the basins by the streams flowing through them into the Gulf of Mexico where such streams emptied. It was further alleged that the land of the complainant, when the river in the flood periods was thus permitted to discharge its waters, was so situated that it was beyond the reach of overflow from the river. It was then alleged that in 1883 the Mississippi River Commission acting under the authority of Congress had devised a plan known as the Eads Plan by which it was contemplated that on both banks of the river, except at certain places which were stated, a line of embankment or levees would be built which in times of high water or flood would hold the water relatively within the lines of the low water banks, thus improving navigation by causing the water to deepen the bed, and saving the country behind the levees from inundation. It was averred that to further this plan the various state levee boards which were made defendants were organized and that all of them within the scope of their power and the limits of their financial ability had aided in carrying on this work and that as the result of their work and of the levees built by the Mississippi

River Commission it had come to pass that from Cairo to the Gulf, a distance of about 1,050 miles, on both sides of the river, except at points which were stated, there was a continuous line of levees restraining the water from flowing out into the basins as above stated and which in many instances cut off the outlets connecting the streams which drained the basins and ultimately carried off the water to the Gulf. It was charged that this line of levees as a whole had been virtually adopted by the Mississippi River Commission, which body had assumed control of the whole subject, and that such body and all the state agencies coöperating were engaged in strengthening, elevating, renewing, repairing and increasing the lines of levee so as to more effectually accomplish the purpose in view.

It was charged "that the effect of the closing by the defendants of the natural outlets along the said river, and the confining of the flood waters between the levee system as a whole is to obstruct the natural high water flow of the water of said river in and along its natural bed for its entire length, thereby raising the level of the water to such an extent that said flood waters, within the last five years, have attained a sufficient height to flow over complainant's land, and when there is now a high water stage in said river, the waters of said river accumulate, flow over and remain standing upon and over said lands of complainant to a depth of from four to eight feet, so that complainant is now being interrupted in the profitable use, occupation and enjoyment of his said land." And it was further alleged that "said land is being covered with superinduced additions of sand, silt and gravel, now from six inches to three feet in depth; the houses and fences thereon are being washed away, rendering the said land and the houses thereon unfit for occupancy, driving away the tenants, doing irreparable harm and injury to said land, impairing its usefulness,

causing the practical destruction thereof, and destroying its market value."

It was averred that to obstruct the river as alleged was a violation of the legal rights of the complainant since he was entitled to the natural flow of the river within its natural high or low water bed free from interference by the acts of the defendants. Averring that no proceedings had been taken to expropriate the land and that no offer to pay for the same had been made and that the acts complained of constituted a taking without compensation in violation of due process of law under the Constitution of the United States, and that there was no adequate remedy at law, the prayer was for an injunction against the Mississippi River Commission and all its officers, employees, agents and contractors, wherever found, and against all the local levee boards and their officers, employees, agents and contractors, perpetually prohibiting them from further building any levees, from enlarging, strengthening, repairing or doing any act to maintain the levees already built and for general relief.

The bill was amended by alleging that the overflow of complainant's land as averred instead of having happened within five years had occurred within one year, and the original prayer was added to by asking that if it was found that the injunction prayed could not be granted, the case be transferred from the equity to the law side and be converted into a law action to recover from the Yazoo-Mississippi Delta Levee Board, the local Mississippi board which alone of the defendants had been served, the sum of five hundred thousand dollars as the value of the plantation alleged to have been wrongfully taken.

A motion by that corporation was made to dismiss the bill on the ground that it stated no basis for relief, and in any event it alleged no ground for equitable jurisdiction since at best upon the theory that a cause of action was

stated, there was plainly an adequate remedy at law. On the hearing the motion to dismiss was joined in by the Mississippi River Commission, and the case is here as the result of the action of the court below in dismissing the bill for want of equity.

At the threshold we put out of view as primarily negligible contentions as to whether in any event, in view of the vast public interests which would have been detrimentally affected, the injunction prayed could have been granted, and whether the suit should not have been dismissed so far as the Mississippi River Commission was concerned on the ground that it was really a suit against the United States without its consent and not a mere action against individuals acting as officers to prevent them from violating the rights of the complainant by taking his property without compensation. We say these contentions are negligible because underlying them all is the fundamental issue whether under the averments of the bill there was any right to relief whatever, and to that decisive question we come. Its solution involves deciding whether the complainant as an owner of land fronting on the river had a right to complain of the building of levees along the banks of the river for the purpose of containing the water in times of flood within the river and preventing it from spreading out from the river into and over the alluvial valley through which the river flows to its destination in the Gulf, even although it resulted that the effect of thus keeping the water within the river was by increasing its volume to so raise its level as to cause it to overflow the complainant's land.

While we are of the opinion that in substance a negative answer to the proposition must follow from applying to this case the doctrines which were upheld in *Jackson* v. *United States*, 230 U. S. 1, and *Hughes* v. *United States*, *id.*, p. 24, as the unsoundness of the distinctions attempted in the argument to be drawn between those cases and this,

and the decisive application of those cases to this, will be more readily appreciated by a recurrence to the legal principles by which the controversy is to be governed, we address ourselves to that subject, looking at it in a twofold aspect: First, with reference to the rights and obligations of the land owners and the power of the State to deal with the subject; and Second, with reference to the power of the United States to erect levees to confine the water for the purpose of improving navigation as superimposed on the right of the land owners or that of the state authorities to construct such levees, if such right obtains, and if not, as independently existing in virtue of the dominant power to improve navigation vested in Congress under the Constitution.

1. Without seeking to state or embrace the whole field of the Roman law concerning the flow of water, whether surface or subterranean, or to trace the general differences between that law, if any, as it existed in the ancient law of the Continent of Europe whether customary or written, or as it prevailed in France prior to, and now exists in, the Code Napoleon, one thing may be taken as beyond dispute, that not only under the Roman law, but under all the others the free flow of water in rivers was secured from undue interruption, and the respective riparian proprietors in consequence of their right to enjoy the same were protected from undue interference or burden created by obstructions to the flow, by deflections in its course, or any other act limiting the right to enjoy the flow or causing additional burdens by changing it. But while this was universally true, a limitation to the rule was also universally recognized by which individuals in case of accidental or extraordinary floods were entitled to erect such works as would protect them from the consequences of the flood by restraining the same, and that no other riparian owner was entitled to complain of such action upon the ground of injury inflicted thereby because all, as the result of the

accidental and extraordinary condition, were entitled to
the enjoyment of the common right to construct works for
their own protection.

Demolombe after commenting upon Article 640 of the
Code Napoleon generally dealing with the servitudes
arising from the flow of water, and pointing out that under
the Roman law as well as under the ancient French law
and the Code Napoleon it was the duty of proprietors
whose lands bordered upon or were traversed by rivers to
permit the water of such rivers to flow their natural course
unimpeded and quoting the Roman law, "*fluminis nat-
uralem cursum non averteré*" (L. 1, Cod. de Alluvionibus),
additionally states that under both the Roman and ancient
law and under the Code Napoleon such proprietors were
bound "to undertake to do no work the result of which
would be to change the direction of the stream or enlarge
its bed or to injure in any manner other proprietors whose
lands border upon or are traversed by the stream,"
(Demolombe, vol. 11, No. 30, p. 36). But the author
at once proceeds to add that the principles thus stated in
no way serve to prevent or to limit the right of proprietors
whose lands border on or are traversed by rivers "from
guaranteeing themselves against damage by defensive
works constructed either upon the border of the rivers or
in the interior of their property against either the per-
manent and insensible action of the rivers or streams or
particularly against the damage caused by the accidental
or extraordinary overflow of their banks; '*Ripam suam
adversus rapidi amnis impetum munire prohibitum non est.*'
(L. 1 Cod de Alluv.)" And proceeding, the author states
that this right of the proprietors undoubtedly exists "even
when the effect of the dykes or other works done will be,
as is nearly always the case, to render the waters of the
river more hostile and damaging to other properties, the
owners of which would have no cause of complaint be-
cause each one is entitled to do the same in his own behalf,

as the right of preservation and of legitimate defense is reciprocal since it is impossible to conceive that the law would impose upon the proprietors bordering upon streams an obligation to suffer their property to be devoured [by accidental or extraordinary overflows] without the power on their part to do anything to protect themselves against the disaster." Proceeding to elucidate and state the limitations by which the right thus universally recognized is safeguarded, the author says: "It is necessary, however, that the works constructed [for the purposes stated] do not encroach upon the natural bed of the water courses, that they should be of course constructed in conformity to the police regulations, if any exist, and finally that they are in fact constructed by those who build them for the defense of their own property, because constructions would not be tolerated which had been erected by a proprietor upon his own land without any necessity whatever for his own protection, but with the only and disloyal purpose of injuring the property of others." Demolombe further states: "What I have just said of streams and rivers is equally applicable to accidental torrents of water which like avalanches may sometimes precipitate themselves upon certain properties. Such a case is likewise one of *vis major* against which each one has a right by the natural law on his own behalf to seek to protect himself as best he may,—a right which, as well said by the Court of Aix is like that which obtains to resist the incursion of an enemy, without being preoccupied as to what may be the result or the wrong suffered by a neighbor who may not have had the foresight to successfully avoid the disaster." The author then proceeds: "These principles which are sustained both by reason and by conceptions of equity, have been for all time recognized both in the Roman law and in our ancient French jurisprudence. They are to-day supported by the unanimous accord of the decided cases and of the opinions of authors (comp. L. 2,

§ 9, ff. *de aqua de aquae;* L. unic., ff. *de ripa munienda;* L. 1, ff. *ne quid in flum. publ.;* Coepolla, tract. 2 cap. XXXVIII, n° 2; Troncon, sur l'art. 225 de la cout. de Paris; Henrys, liv. IV, tit. II, quaest. 75; Domat, Lois civiles, liv. II, tit. VIII, sec. III, n° 9; Aix, 19 mai, 1813, Raousset, Sirey, 1814, II, 9; Duranton, t. V, n° 162; Pardessus, t. I, n° 92; Garnier, t. III, n° 677; Daviel, t. I, n^{os} 384–386, et t. II, n^{os} 697, 698; Taulier, t. II, p. 361).

See *Mailhot* v. *Pugh,* 30 La. Ann. 1359, where some of the authors referred to by Demoiombe and others are quoted and one or more of the adjudged French cases enforcing the limitation are stated and commented upon.

That the general right to an unrestrained flow of rivers and streams and the duty not to unduly deflect or change the same by works constructed for individual benefit as qualified by the limitation as to accidental and extraordinary floods which prevailed in . Rome and on the Continent and which to-day govern in France as stated by Demolombe, also obtained in Scotland, was recognized in 1741 in the case of *Farquharson* v. *Farquharson,* Morr. Dic. 12,779. And the character of the limitation of the rule is well illustrated by *Menzies* v. *Breadalbane,* 3 Bligh, (N. S.) 414, (H. L.), where it was held that it did not apply to a case where a structure was erected in the established high water channel of a stream. It is apparent also from the opinions in *Nield* v. *London and Northwestern Ry.,* L. R. 10 Ex. 4; 44 L. J. Ex. 15; and the statement found in Coulson on the Law of Waters (3rd Ed.), pages 177 *et seq.,* that the limitation as to accidental and extraordinary overflows likewise exists in England.

In this country it is also certain without going into a review of decided cases that the limitation is recognized, although it is true to say that much contrariety and confusion exist in the adjudged cases as to when it is applicable, some cases extending the rule so far as to virtually render the limitation inoperative, others extending the

limitation to such a degree as really to cause it to abrogate the rule itself. But into these differences and contrarieties it is not at all necessary to enter, since there is no decided case, whatever may be the difference as to the application of the limitation, holding that it does not exist, and when in fact the very statement of the general rule requires it to be determined whether that rule as correctly stated would include situations which the limitation if recognized would exclude. We place in the margin a few of the many adjudged cases from which the situation just stated will be made manifest.[1]

Were the overflows in this case accidental and extraordinary, is then the proposition to which the case reduces itself. That the volume of water from the vast watershed which the Mississippi River drains and which by means of percolation and tributaries reach that river, is susceptible now and again of being so simultaneously drained off from the watershed into the river and thus so vastly increasing the amount of water to be carried off in a given time as to cause the overflow of the valley which the river traverses and to thereby endanger the enormous interests concerned, is too well known to require anything but statement. But that the possibilities of such a result do not when such overflows occur cause them to be not accidental is to say the least persuasively established by the ruling in *Viterbo* v. *Friedlander,* 120 U. S. 707. And leaving aside this view, it is obvious from the situation and the causes which in the nature of things may accidentally bring about the emptying into the river at one and the same time of the volumes of water from all the vast sources of supply which drain the expansive watershed

---

[1] *Burwell* v. *Hobson,* 12 Gratt. (Va. 322); *Cairo &c. R. R.* v. *Brevoort,* 62 Fed. Rep. 129; *Crawford* v. *Rambo,* 44 Oh. St. 279; *O'Connell* v. *East Tennessee &c. R. R.,* 87 Georgia, 246; *Taylor* v. *Fickas,* 64 Indiana, 167; *Shelbyville Turnpike* v. *Green,* 99 Indiana, 205; *Mailhot* v. *Pugh,* 30 La. Ann. 1359.

into the river, in the absence of which accidental unison
there could be no flood, that the accidental character of
the unity of the conditions upon which the flood depends
serves to affix that character to the result—the flood it-
self.  But assuming, as we think it must be assumed,
that the words accidental and extraordinary are to be
taken as relating to the river, that is, as alone embracing
conditions not usually there occurring and not ordinary
to the stream in its usual condition having regard to the
flow through its natural bed, whether in high or low water,
that view would be here irrelevant, since there is no sug-
gestion of any bed of the river in high or low water except
the space between the natural banks along which the
levees were built unless the whole valley be considered
as such bed.  Indeed from the face of the bill it is apparent
that the rights relied upon were assumed to exist upon the
theory that the valley through which the river travels,
in all its length and vast expanse, with its great popula-
tion, its farms, its villages, its town, its cities, its schools,
its colleges, its universities, its manufactories, its net-
work of railroads—some of them transcontinental, are
virtually to be considered from a legal point of view as
constituting merely the high water bed of the river and
therefore subject, without any power to protect, to be
submitted to the destruction resulting from the overflow
by the river of its natural banks.  In fact the nature of
the assumption upon which the argument rests, is shown
by the contention that the building of the levees under the
circumstances disclosed was a work not of preservation
but of reclamation, that is, a work not to keep the water
within the bed of the river for the purpose of preventing
destruction to the valley lying beyond its bed and banks,
but to reclaim all the vast area of the valley from the peril
to which it was subjected by being situated in the high
water bed of the river.  If it were necessary to say any-
thing more to demonstrate the unsoundness of this view,

it would suffice to point out that the assumption is wholly irreconcilable with the settlement and development of the valley of the river, that it is at war with the action of all the state governments having authority over the territory, and is a complete denial of the legislative reasons which necessarily were involved in the action of Congress creating the Mississippi River Commission and appropriating millions of dollars to improve the river by building levees along the banks in order to confine the waters of the river within its natural banks, and by increasing the volume of water to improve the navigable capacity of the river.

2. Although in view of the conclusion just stated it is unnecessary to refer to the power of Congress to build the levees under the paramount authority vested in it to improve the navigation of the river, we cannot fail to point out the complete demonstration which that power affords of all want of legal responsibility to the complainant for the building of the levees complained of. In this connection it is to be observed that the complete application of this power is in the reason of things admitted by the erroneous assumption upon which alone the arguments proceed in seeking to avoid the effect of the well defined limitation as to accidental and extraordinary floods, that is, the erroneous contention as to the high water bed of the river which we have disposed of. We say this since it is apparent that if the property in the valley were to be treated as in the bed of the river, that would be true also of the property of the complainant, hence causing it to come to pass that as to such property so situated there would be no possible lawful ground of complaint to arise from the action of Congress in exerting its lawful power over the bed of the river for the improvement of navigation.

These conclusions dispose of the case without the necessity of recurring, as we proposed at the outset to do,

to the rulings in the *Jackson* and *Hughes Case* (230 U. S. 1, *Id.* 24), but in the light of the principles we have stated, we direct attention to the fact that the attempt to distinguish the *Jackson Case* upon the ground that relief was there denied because the proprietor on one side of the river, who complained of the increase of the flood level and injury to his land from the levees erected on the other side or from the levee system as a whole, had himself erected a levee to protect his property and therefore was estopped, is without foundation. It is plain when the context of the opinion in the *Jackson Case* is considered that the denial of the right to relief in that case was rested not upon the conception that a right existing on one side of the river was destroyed by estoppel and a right not existing on the other was conferred by the same principle, but upon the broad ground that the rights of both owners on either side embraced the authority without giving rise to legal injury to the other, to protect themselves from the harm to result from the accidental and extraordinary floods occurring in the river by building levees if they so desired. Additionally when the principle laid down in the *Jackson Case* is illustrated by the ruling which was made in the *Hughes Case*, it becomes apparent that the contention here urged as to the identity between the great valley and the flood bed of the river was adversely disposed of, since under no view could the ruling in the *Hughes Case* have been made except upon the theory that the bank of the river was where it was found and did not extend over a vast and imaginary area.

*Affirmed.*

MR. JUSTICE PITNEY concurs in the result.