Jones et al. v. George et al.

[89 South. 231. In Banc. No. 21214.]

1. Judgment. *Elements necessary to plea of res judicata enumerated.*
Before a plea of *res judicata* can prevail, four things must be shown: "First, identity in the thing sued for; second, identity in the cause of action; third, identity of persons and parties to the action; and, fourth, identity of the quality in the person for or against whom the claim is made."

2. Judgment. *Drainage district not concluded by former adjudication* against county.
A drainage district is a separate entity, a corporation with powers to sue and be sued, and is not an agent or subdivision of the county, and is not concluded by a former adjudication against the county relating to the same subject-matter.

3. Waters and Water Courses. *Riparian proprietor entitled to free flow*
A riparian proprietor is entitled to the free flow of water in rivers secured from undue interruption.

4. WATERS AND WATER COURSES. *Riparian proprietor entitled to erect levees.*

A riparian proprietor or drainage district is entitled to erect levees or such other works as will protect its lands from the accidental or extraordinary flood waters of a stream. No other riparian owner can complain of this action because of injury thereby inflicted upon him.

5. WATERS AND WATER COURSES. *Erection of levees, causing damage, not actionable wrong.*

By thus protecting themselves against these accidental or extraordinary waters of a stream, there is no invasion of a right of any other riparian proprietor. If they are damaged, it is damnum absque injuria, which damages are not contemplated by section 17 of the Constitution of 1890.

ETHERIDGE and COOK, JJ., dissenting.

APPEAL from chancery court of Leflore county.

HON. JOE MAYS, Chancellor.

Suit by W. C. George and others against S. F. Jones and another for an injunction. Decree for complainants, and defendants appeal. Reversed, and bill dismissed.

*Gardner, McBee & Gardner, Watkins, Watkins & Eager,* and *Pollard & Hamner,* for appellants.

*Gwin & Mounger,* for appellees.

SYKES, J., delivered the opinion of the court.

The appellees, complainants in the chancery court, in substance allege in their bill that the appellants, S. F. Jones and the Lake Henry drainage district, are threatening to repair a levee, originally built by Jones, which dams up Burr bayou; that some of the complainants are riparian owners on the Tallahatchie river, which is a navigable stream, while other complainants own lands a short distance from the river which they allege will be affected by the levee of Burr bayou. In this case and the companion case of *Jones et al. v. Bell et al.,* 89 So. 237, this day decided, it is shown that the complainants in these two cases own

37

lands on both sides of the river, both above and below Burr
bayou, which is about seventeen miles measured along the
course of the river above its confluence with the Yalobusha
river and on the west side of the Tallahatchie river. This
bayou is described in the bill as a large natural water
course. The channel is stated to be from one hundred and
twenty-five to three hundred feet wide and approximately
fifteen feet deep, and is the center or thread of a natural
depression, which depression is a part of a water course
or bayou from one-quarter to one-half mile wide and from
one to five feet deep. This bayou extends from its point
of emergence from the Tallahatchie river, in a direction
practically perpendicular to the course of the river, for a
distance of one-half to three-quarters of a mile, where it
gradually becomes shallow and widens into a large slough
or depression approximately a mile in width and several
miles long, inclining from both sides to the well-defined
thread or channel, or said depression, which said portion of
said bayou is known as "race track." When Tallahatchie
river is at flood time—that is to say, when there is in said
river a condition known as high water, a condition which
now ordinarily and frequently exists, and has from time
immemorial been habitually recurring, and is now apt at
any time to recur, from rains and floods in the said river
or its headwaters and tributaries—an enormous volume of
water flows out of the Tallahatchie river through the said
Burr bayou, including the depression of which it is the
thread or center, and which, during such times, is filled
bank full and flows with great velocity on through said
"race track," the water in which latter is ordinarily during
such times of great depth and more than a mile in width.
This water flows thence into and through a low, flat hollow
or depression from one and one-half to three miles wide,
and three miles or more long, through sloughs, bayous, and
brakes, into Lake Henry, a large natural water course,
which in turn empties into Turkey bayou, a large natural
water course, then into Quiver river, a large, natural water
course, thence into the Sunflower river, a navagable

stream, a point fifteen miles or more from the point of divergence of Burr bayou from the Tallahatchie river; there being thus a well-defined natural water course, variously named as above, but forming one connecting channel from the Tallahatchie river westwardly to the Sunflower river, through which the water from the Tallahatchie river has flowed in times of ordinary flood from time immemorial, and by which the Tallahatchie river, as to the territory which embraces the lands of the complainants, is entirely and permanently relieved of the vast volume of water hereinbefore described, and the continued existence of said outlet is necessary to carry out the water cast into the Tallahatchie river by ordinary and habitually recurring floods, and which has from time immemorial naturally, ordinarily, and habitually flowed along said water course into the Sunflower river.

The bill further charges: ' That just before the usual spring freshet in the Tallahatchie river in the year of 1911, when there was imminent and threatening a condition of flood tide, and high water caused by rains in the headwaters and tributaries in the Tallahatchie river, the appellant Jones, without the knowledge or consent of the complainants, erected and constructed across the channel of Burr bayou a levee, and during the flood of 1911 and other subsequently recurring periods of the condition of high water, the flood waters of the Tallahatchie river stood in the channel of Burr bayou. ' That this levee wholly obstructed and prevented the flow of water from the Tallahatchie river through this bayou during the period of high water, and that by reason of the construction of this levee there was collected an unusual and abnormal quantity of water, ponded and banked up in the Tallahatchie river, retarding the flow, increasing the volume, and augmenting the stage of water in the river, causing an unusual and abnormal rise of water in the river, and casting these waters upon the lands of the complainants, which lands had never been overflowed prior to the construction of the levee.   That in the high water of the spring of 1912, when the Tallahat-

chie river was at the highest stage, a crevasse occurred in this levee, and a part of it was washed away. It is claimed that the remaining part of the levee obstructs the flow of these flood waters through Burr bayou.

The bill alleges: That the repairing and reconstruction of this levee, or of another levee across Burr bayou, will prevent the free and unhindered flow of the flood waters of Tallahatchie river through the bayou in times of high water, and will pond and bank up the waters in the river, and cause the collection of an unusual and abnormal quantity of water, retard the flow, increase to an abnormal extent the volume, and augment the state of water in the river, and cause an abnormal and unusual rise in the water of said river, so that the channel of the rievr will be in sufficient to carry off the water cast into it in times of ordinary and habitually recurring floods, causing the water in the river to run over its banks and upon the lands of the complainants, thereby overflowing lands which had never before been overflowed. That the lands of the appellant Jones, through which Burr bayou extends are embraced in the Lake Henry drainage district. That this drainage district has petitioned the chancery court to be granted an order to rebuild this levee across Burr bayou. The bill prays that both appellants be perpetually enjoined from repairing this levee or building another one across Burr bayou.

The bill in the case of *Jones et al.* v. *eorge et al,* further alleges that this controversy is *res adjudicata,* because of a decision rendered in the case of *Leflore County* v. *Cannon,* reported in 81 Miss. 334, 33 So. 81; that two of the complainants herein were two of the original complainants in the Cannon Case; that in the Cannon Case the board of supervisors and Leflore county were perpetually enjoined from erecting or constructing or entering into any contract for the erection or construction of any dam or levee across Burr bayou, or in any wise obstructing said bayou, so as to prevent the free and unhindered flow of the flood waters of the Tallahatchie river through the same, without first making due compensation to the complainants for the damage

resulting or to be inflicted thereby. That the other complainant in this case is a grantee of the other original complainant in the Cannon Case. · That appellant Jones was one of the petitioners who requested the board of supervisors of Leflore county to build the levee involved in the Cannon Case. That the drainage commissioners of Leflore county are appointees and delegates of the board of supervisors of the county. For these reasons it is claimed that the same subject-matter, between the same parties, or those in privity with them, by the Cannon Case was therein adjudicated and decided adversely to these appellants. Suffice it to say that the answer denies the material averments of the bill.

As to the question of *res adjudicata,* this court has held that, before this plea can prevail, four things must be shown:

"(1) Identity in the thing sued for; (2) identity in the cause of action; (3) identity of persons and parties to the action; and (4) identity of the quality in the person for or against whom the claim is made." *Creegan* v. *Hyman,* 93 Miss. 493, 46 So. 954.

The appellant Jones was not a party to the original Cannon suit; neither was the Lake Henry drainage district, nor the drainage commissioners of Leflore county. The appellant Jones as an individual was not bound by the proceedings in the Cannon Case. A drainage district is a separate entity, a corporation with powers to sue and to be sued, and is not an agent or a subdivision of the county concluded by the previous decision. *Robertson* v. *Thomas,* 118 Miss. 426, 79 So. 289.

There was a vast amount of testimony taken in these cases. That material, however, to a decision of this controversy, can be briefly stated as follows: The west bank of the Tallahatchie river, both above and below Burr bayou, is higher than the east bank. Burr bayou starts at the bank of the Tallahatchie river; its exact width and depth on the bank of the river is not accurately shown. During most months in the season it is practically dry, and it is

only in times of high water, called in the bill "flood water," that water flows from the Tallahatchie river into Burr bayou. When the Tallahatchie river is not high, the flow of surface water is from Burr bayou into the river. For a distance of several hundred yards from the bank of the Tallahatchie river Burr bayou has a well-defined channel. This channel then becomes shallower, and in places it is very hard to find the bottom of the channel because of the surrounding lowlands, and in places in flood water time the water spreads out a mile or more in width and is very shallow.

The testimony shows that years ago there had been a number of openings upon the west bank of the Tallahatchie river similar to Burr bayou, but that all of these openings had been closed, except this one. Several witnesses were asked about how often water flowed from the Tallahatchie river into Burr bayou. Mr. Knight testified it flowed through Burr bayou "every time we had anything like an overflow, ordinary overflow." Mr. Bell testified that the river got high enough for water to run through Burr bayou every year. Mr. Barry testified that water ran in this Bayou every spring; that it went through there when the Tallahatchie river was at a high-water stage; that there was not any water in this bayou at other times, except some rain water. All of the testimony shows that trees had grown up in the thread of the course. The bayou is thus described by some of the witnesses:

By Mr. Peteet, one of the complainants:

"It was like the other bayous on the river which serve as an outlet for the river in flood times, washed out, supposed by natural erosion from water."

Maj. Dabney, an expert on all levee and drainage matters in the Mississippi Delta, thus describes it:

"That Burr bayou is a natural overflow waterway for the excess floods in the Tallahatchie river, that it was developed in obedience for an outlet for these overflow waters. I find a continuous depression leading back from the levee, and Burr bayou, as shown by the profiles, has conveyed

these overflow waters back into a series of depressions and channels into Lake Henry."

In another place he says that: "Burr bayou is not a well-defined bayou channel, except near the river; but there are depressions which lead away which are always for use in the overflow waters."

All of the testimony shows that no water flows through Burr bayou, except when a high stage of water has been reached in the Tallahatchie river, or as it is repeatedly referred to both in the bill and in the testimony, when the river has reached a flood stage. The testimony is somewhat vague and uncertain as to the times when this stage is reached. Most of the testimony is directed to conditions existing during periods of very high water, when there were general overflows all along the river. However, we assume that the testimony means that this flood water stage is reached at least once a year, namely, in the spring which is the time most streams have their highest water, and that before the water of the Tallahatchie river begins to spill over the opposite or east bank, it begins to flow through Burr bayou, and that Burr bayou in times of flood carries off an appreciable amount of water of the Tallahatchie river.

None of the complainants in this case is a riparian owner upon Burr bayou. The complaint is that this levee prevents the flood waters of the Tallahatchie river from escaping through Burr bayou, thereby holding within the channel of the river a large volume of water and forcing it to overflow its banks upon the complainant landowners. The levee in this case is built in the shape of a horseshoe, starting on the banks of the Tallahatchie river, and crossing the channel of Burr bayou several hundred feet from the river bank, and extending thence back to the bank of the river.

It is the law that the free flow of water in rivers secured from undue interruption is an undoubted right of a riparian proprietor. Riparian proprietors are protected from undue interference created by obstruction to this flow. To

this rule, however, there is a well-recognized exception, namely, that other proprietors, in case of accidental or extraordinary floods, are entitled to erect such works as will protect them from the consequences of the flood, and that no other riparian owner is entitled to complain of such action upon the ground of injury inflicted thereby, because all, as a result of an extraordinary and accidental condition, are entitled to the common right to construct works for their own protection.    That this is not only the law in the different states of these United States, but that it is also the law of the European countries, is conclusively demonstrated by the masterly opinion of the late Chief Justice WHITE in the case of *Cubbins* v. *Mississippi River Com.*, 241 U. S. 351, 36 Sup. Ct. 671, 60 L. Ed. 1041.

The narrow question for decision in this case, as it was in the Cubbins Case, is whether or not the flood stages of the Tallahatchie river, which must be reached before Burr bayou begins to carry off any of the waters of this river, are the usual and ordinary condition of the stream, or whether it is an accidental and extraordinary condition of the river.    In that opinion it is stated:

"But assuming, as we think it must be assumed, that the words 'accidental' and 'extraordinary' are to be taken as relating to the river; that is, as alone embracing conditions not usually there occurring and not ordinary to the stream in its usual condition having regard to the flow through its natural bed, whether in high or low water."

It is a well-known fact that the Mississippi river reaches the flood stage complained of in the Cubbins Case every spring, due to the large volume of water thrown into it from its tributaries caused by the melting of snows and the rainfall in its watershed.    We also know that the Tallahatchie river, and other rivers in this state, carry a large volume of flood water about the same time as does the Mississippi, namely, in the spring, due in a limited extent to the same causes which govern the Mississippi river, limited, however, to their restricted watershed and practically eliminating any meltings of snow and ice; but the cause of both are

accidental, and the condition existing in both rivers at this period of flood water is not the usual condition of the river, but is an accidental and extraordinary condition of the river, due to accidental causes. It is only when this accidental and extraordinary condition exists in the Tallahatchie river that Burr bayou carries off its flood waters.

Precisely the same question was decided by this court in the case of Indian Creek Drainage District No. 1 1. Garrott, 123 Miss. 301, 85 So. 312. In that opinion the authorities in this state and others are reviewed by Justice HOLDEN. In speaking of so-called water courses obstructed in that case it is said:

"There was no regular and continuous current in these natural water courses. The levee did not interfere with the flow of their own waters, because they had no flow, except that produced by the flood waters form the river. There fore the levee obstructed only flood waters, which at unusual times passed through these outlets or conduits."

The *Cannon Case,* in 81 Miss. 334, 33 So. 81, and the *Carcier Case,* 103 Miss. 324, So. 326, both dealt with the rights of the counties, in building and maintaining public roads, to build levees across bayous or outlets; the one in the Cannon Case being this same bayou. In each of those cases the county could very well have built bridges or trestles, instead of the levee, and those cases should have been decided against the county for this reason. We think the decision in those two cases for the above reason was correct, but in both opinions the court dealt generally with the right to obstruct the waters of a stream, and simply overlooked the fact that in both cases they were dealing with flood waters produced by extraordinary and accidental conditions. In those cases the counties were not leveeing these bayous in order to protect their lands from flood waters. In this case the drainage district and the individual appellant landowner have this right. This distinction is not made, however, in either one of these cases. The parts of those two opinions which deal with the waters there in

question as the usual ordinary waters of a stream are in conflict with this opinion and are hereby overruled.

The contention is further made that the property of these appellees is damaged by the building of this levee, for which they are entitled to compensation under section 17 of the Constitution of 1890. This question is also disposed of in the *Indian Creek Drainage District Case, supra.* It is there held that damages resulting without legal injury are not contemplade by the Constitution. There is no invasion of any right of the appellees by fending against these escaping flood waters, and for this reason they have sustained no damages under this section of the Constitution.

The decree of the lower court is reversed, the injunction dissolved, and the bill dismissed.

*Reversed, injunction dissolved, and bill dismissed.*

COOK, J., dissents.

ETHRIDGE, J. (dissenting).

I am unable to concur with the majority in its conclusion in this case and the companion case of *S. J. Jones et al.* v. *W. R. Bell et al.* (No. 21215) 89 So. 237, this day decided. I might well rest with my dissenting opinion in the case of *Indian Creek Drainage District No. 1.* v. *Garrott,* 123 Miss. 301, 85 So. 312, beginning at page 330 of the Mississippi Report (85 So. at page 322), but for the fact that in the opinion of the majority in that case the opinions in the cases of *Leflore County* v. *Cannon,* 81 Miss. 334, 33 So. 81, and *Board of Supervisors of Quitman County* v. *Carrier Lumber Co.,* 103 Miss. 324, 60 So. 326, were treated by the majority of the court as not being inconsistent with the opinion in that case, whereas in one of the present cases the Cannon Case is not only precisely in the path of a reversal, but comes near being *res adjudicata* of the controversy in one of the cases before us. The identical stream involved in the Cannon Case is involved in the present case.

In that case the decision rested upon the allegations of the bill. In this case the allegations of the bill are practically identical, and proof for the appellees amply support the allegations of the bill, and the chancellor found that Burr bayou was a running stream.

The drainage laws under which these cases arise were enacted subsequent to the enactment of section 17 of the Constitution of this state, and subsequent to the interpretation of section 17 in the masterly opinion of Judge Woods in *Vicksburg* v. *Herman,* 72 Miss. 211, 16 So. 434, and the decision in *Richardson* v. *Levee Commissioners,* 77 Miss. 518, 26 So. 963, and *Duncan* v. *Levee Commissioners,* 74 Miss. 125, 20 So. 838.

In view of the provisions of section 17 of the Constitution, as construed by the decisions in the above cases, we cannot reasonably infer, I think, that the legislature in enacting the drainage district laws contemplated the obstruction of natural water courses without the drainage district paying for such damages, both direct and indirect, as would accrue to property owners by such construction. It was clearly intended by the legislature that, in exercising the powers conferred on drainage districts when created, damages would be paid to all property owners whose property was damaged in so doing. If it was not so intended by the legislature, still section 17 of the Constitution must be read in connection with the powers conferred on drainage districts, and the paying of damages done to property was a condition precedent to the exercise of such powers by such districts. The legislative scheme was that drainage districts could be established for the benefit of the public, and not for the benefit of the individuals as such. The legislature never intended that the power of the state should be used in any case in creating a drainage district where the damage resulting therefrom to the public or members of the public would exceed the benefits flowing from the improvements contemplated by the drainage chapters.

When the people sought to exercise the powers of the state through the agencies of a public corporation created by the state for public purposes, it was contemplated that they would take a broad survey of the drainage project, and calculate the cost of the improvement and of the damages that would flow to other property owners from such improvement, and set these over against the benefits that would be derived with reasonable certainty from the drainage district, and unless the benefits exceeded the cost and damages that such district would not be created. Regardless of the law, it could not be rightfully created, if the damages and costs were greater than the benefit to be derived. It would be foolish to imagine the legislature giving the power and prestige of the state through one of its public corporations to one individual or a number of individuals as an instrumentality for doing wrong and damage to other citizens of the state.

In the cases before us the western bank of the Tallahatchie river is generally higher than its eastern bank; but certain openings like the one in question existed in said banks, and through these openings in times of high water the surplus water of the river flowed out through regular channels and waterways, so as to disperse the waters and relieve the channel of the river of the accumulatd water. From the east numerous streams flow from the hills to Tallahatchie and Cold Water rivers, and under natural conditions a portion of these surplus waters were conveyed away in a westerly and southwesterly direction, and much property on the east side was saved from overflow. This property, or a great deal of it, had been acquired by individuals and corporations on the faith of the stability of this court in its previous opinions, and the strip between the hills and the river is a vast and fertile country which has been greatly developed by the owners of the property.

Under the decision in the *Indian Creek Drainage Case, supra,* and in the present cases, these outlets and channels for the high waters of these rivers may be and will be dammed up, and the natural result will be (as is shown

amply by the proof in the present cases) that much of the land on the east side of the river, which heretofore has never been flooded, will be flooded in times of ordinary freshets, and those valuable farms will be greatly damaged, and many of them destroyed as farming propositions. Naturally the east side of the river cannot be successfully leveed, because of the running streams flowing from the hills.

The waters of Tallahatchie river begin to flow through Burr bayou long before the river reaches the general level of the banks. The proof shows that a large volume of the flood waters of the said river were carried through this outlet and natural water course. The decisions in the present cases seem to establish the doctrine that, to constitute a stream, there must be waters flowing regularly through it, and if this is not the distinction sought to be made between these cases and the *Richardson Case* and the *Duncan Case, supra,* I am unable to perceive what distinctions may be drawn.

In *Ferris* v. *Wellborn,* 64 Miss. 29, 8 So. 165, this court distinctly held that a stream in which water flowed in times of high water, or when there was water to flow, was a water course that could not be obstructed without paying damage to owners of property who were damaged thereby. The same thing was distinctly decided in Belzoni Drainage *Commission* v. *Winn,* 98 Miss. 359, 53 So. 778, and was reannouncel in *Crenshaw* v. *State,* 101 Miss. 457, 58 So. 219. The opinions in the present cases run absolutely counter to these decisions, yet they are not mentioned, being neither qualified nor overruled. In *Thompson* v. *M., J. & K. C. R. R. Co.,* 104 Miss. 651, 61 So. 596, the doctrine was distinctly announced that where a railroad obstructed a running stream, no matter to what extent, it was liable for the damages resulting from the obstruction of the stream.

No distinction is made in the present cases or attempted to be made between these cases and the *Richardson* and *Duncan Cases, supra, Hughes* v. *Levee Commissioners,* 27 So. 744, *Corley* v. *Levee Commissioners,* 95 Miss. 617, 49

So. 266, and *A. & M. Railroad* v. *Beard,* 93 Miss. 294, 48
So. 405, though the facts and law as therein announced
seem clearly to support the doctrine that a running steam
or a bayou, that was only a running stream at certain times,
could not be obstructed without paying damages resulting
to property owners from such obstruction.

The decisions in the present cases seem to flush a whole
convey of decisions, wounding, if not killing, them, without
even so much as a word to enlighten the citizen, the bar,
or the trial courts as to what effect these decisions shall
have in the future.   It seems to me that the *Indian Creek
Drainage Case, supra,* and the present cases, are a radical
departure from the decisions of this court since 1890 until
the present time.   It is a reversion to original type of the
doctrine of despotic government, which requires the citi-
zen to submit to confiscation and destruction of his prop-
erty at the behest of the government; a going back to "the
simple plan, that those may take who have the power, and
those may keep who can."

The Constitutions of the several states have established
the policy of requiring the public, rather than the indi-
viual alone, to bear the burden of suffering the damage
that might flow from the exercise of governmental right in
taking or injuring property for the public benefit.   Under
the original Constitution of our state compensation was
only for the taking of property, and various cases arose in
which indirect damage was done property without a tech-
nical invasion of the property, and for which the govern-
ment was not responsible to the individual.   To cure this
evil the constitutional convention of 1890 inserted the
words "or damaged" after the word "taken," so as to read
that "private property shall not be taken or damaged for
public use," etc.   Soon after the enactment of this consti-
tutional provision the court, in *Vicksburg* v. *Herman, sup-
ra,* construed this provision, giving to it a broad and liber-
al interpretation in favor of the property owner, and point-
ing out the policy of the constitutional convention in mak-
ing the change.   I regard this decision as one of the ablest,

both in argument and conclusion, of any of the decisions of the country, and the fame of the learned judge who wrote it rests secure.

From that day on until the decision of the *Indian Creek Drainage Case, supra,* the doctrines of that case have been universally applied in cases where private property was either taken or damaged for the use of the public. The effect of these latter cases has been to seriously disturb the law upon the subject. I thought the citizen was secure in the enjoyment of his property at least against the government and its agencies; but the decision of the *Indian Creek Case, supra,* was a powerful shell from the judicial "Big Bertha" which came near demolishing the citadel of constitutional liberty. In the present cases the second shot is fired, and I suppose all of these precedents which have been guarding the citadel will be destroyed one by one as they come under review hereafter. It is hard to tell from the decisions the extent to which prior cases have been qualified, and which of them have been overruled. The litigant, the lawyer, and the court must each judge for himself to what extent they have been affected and qualified, for the *Indian Creek Drainage Case,* did not distinguish them at all, while in the present cases the *Cannon Case* and the *Carrier Case, supra,* are overruled to the extent only that they conflict with the decisions in the present cases. Just to what extent they do conflict every man is left to guess.

*The Cubbins Case,* 241 U. S. 351, 36 Sup. Ct. 671, 60 L. Ed. 1041, from the United States supreme court, is again relied on in justification of the present decision; but it is far from being an authority to. support the case. Chief Justice WHITE, in delivering that opinion, was careful to point out the difference between the Mississippi river and ordinary streams or rivers. He was also careful to point out that the waters leveed against were not waters within the banks of a stream. I do not think the flood water involved in this case constitute an accidental or extraordinary flood. They are such as occur regularly, annually, and

oftener in many cases, according to the proof in these cases.

There is a marked distinction in my mind between the right of an individual to dam against flood waters and his right to dam a stream through which waters flow before the general river banks overflow. Where flood waters overflow the banks, generally the riparian owner has a right to protect his property therefrom; but he has no right to dam up a natural channel through which high waters flow before the river reaches flood stage. There is also, in my opinion, a material difference between the right of an individual or a private corporation as riparian owner, and the rights of the public corporations, which must have the power and prestige of the state to exercise rights. An individual must necessarily be limited, both in the extent of the construction and in the amount of cost involved in constructing a levee; whereas a drainage district, as a corporation, has multiplied power in this field. An individual is restrained by a decent regard for his neighbors' rights and with a wholesome fear of his neighbors' anger, in case he goes too far in inflicting injury upon his neighbor; but the state may create a public corporation against which the individual is powerless, and it may and frequently does wholly ignore a citizen's rights or his feelings in the work it may do.

A corporation exercising the power of eminent domain is exercising a public power, which in the nature of things can only be exercised for the public good, and no construction should be adopted which impairs the provision of the Constitution for compensation or damages for the taking of property for the public good.

*The Cubbins Case, supra,* cited in the majority opinion, and other cases from the United States supreme court referred to in the Cubbins Case, arise against the national government in exercising its powers for the national good, which are governed by the Constitution of the United States, which does not prohibit damaging property for the public. The supreme court of the United States would

not so hold, and would have rendered a different judgment, had the national Constitution contained the words "or damaged." This' view, I think, is conclusively established in the case of *Chicago* v. *Taylor,* 125 U. S. 161, 8 Sup. Ct. 820, 31 L. Ed. 638 et seq. The authorities cited in that case with the approval of the supreme court of the United States make this conclusion, it seems to me, inevitable.

I have said this much because I shall feel compelled to follow these cases as a precedent hereafter, unless and until they may be overruled by this court, which I earnestly trust may come to pass.