COVINGTON *et al. v.* CASSIDY BAYOU DRAINAGE DIST.

(En Banc. May 6, 1929.)

[122 So. 205. No. 27297.]

*Lowrey & Lamb,* of Marks, for appellants.

122

*M. E. Denton,* of Marks, for appellee.

124

Argued orally by *P. H. Lowrey*, for appellant, and *M. E. Denton*, for appellee.

ANDERSON, J., delivered the opinion of the court.

Appellants filed the bill in this case in the chancery court of Quitman county against appellee, a drainage district organized under chapter 195, Laws of 1912, as amended by chapter 269, Laws of 1914, asking for a mandatory injunction requiring appellee to remove a dam th006retofore constructed by it across Cassidy Bayou, southwest of Belen, at a point where Moore's Bayou and Cassidy Bayou come together. There was a trial on bill, answer, and proofs, resulting in a final decree denying the appellant's the relief prayed for. From that decree appellants prosecute this appeal.

The construction of the dam in question was a part of a scheme of appellee to reclaim and make fit for cultivation the swamp and overflowed lands of the drainage district. The appellants owned lands outside the drainage district, between the dam in question and the mouth of Cassidy Bayou, where it empties into Coldwater river, and along Moore's Bayou. They charge in their bill that Cassidy Bayou is a well-defined watercourse, a running stream, and a natural drainage for their lands, and that the dam at the place where constructed caused the waters of Coldwater river, in times of excessive rains and floods, to damage their lands. Appellants also charge in their bill that the question of the location and construction of

the dam at the point where it was located and constructed is *res adjudicata,* the question having been decided adversely to appellee in a former suit instituted by appellants against appellee in the chancery court of Quitman county, but that, if mistaken in that position, nevertheless, they are entitled to have the dam, as located and constructed, removed because of the reasons first above set out.

The following statement of the case is deemed sufficient to develop the questions involved:

Appellee, the drainage district, was organized in 1914. Among the plans for the reclamation of the swamp and overflowed lands embraced in the district was the construction of a dam. Appellee planned to construct the dam across Cassidy Bayou, southwest of Belen, where Moore's Bayou joins Cassidy Bayou, and, when that plan became known to appellants they filed a bill in the chancery court of Quitman county to enjoin the construction of the dam at that point, charging substantially, as in their present bill, that Cassidy Bayou was a running stream, a well-defined watercourse, and a natural drainage for their lands, and that, by the construction of the dam as planned, their lands would be injured by the flood waters of Coldwater river, as well as other waters during excessive periods of rainfall. Upon the filing of the bill in that case, a temporary injunction was granted, enjoining appellee from the construction of the dam at the point planned. That case stood undisposed of until the decision of the *Indian Creek Drainage District case,* 123 Miss. 327, 85 So. 312. After the decision of the supreme court in that case, appellee took steps to bring the case to a hearing, and the result was a compromise consent decree was entered, which, leaving off its formal parts, follows:

"Came on this cause this day for hearing, and came all of the parties, complainant and defendant, by their solicitors, and a part of the evidence being taken and

128

heard, all of the parties herein in open court by their solicitors agreed upon a settlement of this suit as follows: The complainants shall and do hereby dismiss the bill, assuming all court costs, but without the payment of any damages on account of the injunction herein. The defendants agree on their part not to construct the levee and dam complained of, but in lieu thereof to construct a levee and dam across the said bayou at a point at the town of Marks, near Coldwater river, on the west side of Yazoo & Mississippi Valley Railroad upon the condition that the complainants will furnish and pay sufficient money to cover all costs of the construction of the said dam and levee in excess of one thousand two hundred dollars, said dam and levee to be constructed and built by and under the direction of and at a place satisfactory to the commissioners and engineer of the defendant drainage district. The land for the location and construction of the said levee and dam and the right of way for the same, and the cost of the material for construction of same, to be furnished and paid for by the complainants herein. It is therefore considered by the court and ordered and adjudged and decreed that this cause be and is hereby dismissed, and that the complainants pay all cost herein, and that no damages on account of the issuance of the said injunction shall be recovered by the defendants, and that the defendants shall not construct the levee and dam mentioned in the declaration, or any other dam or levee across Cassidy Bayou, except as herein stipulated, and that the complainants shall furnish and pay to the defendants all of the cost and expenses in excess of one thousand two hundred dollars of the construction of the said levee and dam across the said bayou at Marks, in accordance with such plans and specifications as the said drainage commissioners and the engineer shall provide, and, if necessary, pay for the land and right of way across the said bayou for the location of the said levee

and dam, and provide and furnish the necessary material for the construction of the said dam and levee, and shall pay all cost herein, for which execution may issue.''

After the entry of that decree, appellee's engineer examined Cassidy Bayou with a view of locating and constructing a dam at Marks near the Coldwater river, on the west side of the Yazoo & Mississippi Railroad, as provided in the decree, and estimated that it would cost, approximately, seven thousand dollars. The appellants were given notice of that fact, but they failed to offer to pay, or tender, the additional cost of the dam in excess of one thousand two hundred dollars, as provided in the decree. Thereupon appellee proceeded to construct the dam, and did construct it, across Cassidy Bayou at the original site selected. After the dam had been so constructed, and had been in use for several years, and the drainage district had issued and sold its bonds to raise funds to pay therefor, as well as other expenses necessary to carry out the scheme of drainage of the lands of the district, the bill in the present case was filed by appellants.

As stated above, the result of the trial in the present case was that a decree was rendered, dismissing appellants' bill, which decree, leaving off its formal parts, follows:

''This cause having come on for final hearing on the original bill herein and the answer of all defendants thereto and proof heard in open court at the regular October term, 1927, of the chancery court of Quitman county, Mississippi, and the court at said term, after hearing all of the evidence in the case, having taken said cause under advisement for argument and for decree to be made and entered in vacation, by agreement of all parties, as shown by the order made and entered upon the minutes of said court at the said regular term, and the chancellor of said court in vacation now having heard the argument of counsel and fully considered said cause, and

being fully advised in the premises, is of the opinion that the complainants are not entitled to the issuance of the mandatory writ of injunction against the defendants for the removal of the dam across Cassidy Bayou, in controversy in this case, or to any relief prayed for in the bill of complaint, the chancellor finding the following:

"That Cassidy Bayou, at the point where the dam in controversy is located, is not a running stream, except at the time of flood waters.

"That the flood waters in Cassidy Bayou, above the dam in controversy, do not, as a result of the ordinary and usual floods from year to year, get sufficiently high as to cause damage to the complainants, but that in case of an unprecedented flood, such as that of the year 1927, and in such case only, does the dam in question cause the flood waters in said bayou to overflow and damage the property of the complainants in the manner and to the degree testified about in this case.

"That the dam in controversy was located at the present site as a part of the plans and specifications adopted by decree of the chancery court of Coahoma county, Mississippi, during the year 1924, for the Cassidy Bayou drainage district, after due notice to the landowners therein, and that the bonds of said district were issued for the construction of the drainage system according to such plans and specifications, and that such bonds were sold shortly after the passage of chapter 269 of the Laws 1914.

"That neither the commissioners of said drainage district nor its attorney had the power and authority to consent to a compromise decree, in the year 1920, in the case of *W. T. Covington et al.* v. *Cassidy Bayou Drainage District*, in the chancery court of Quitman county, Mississippi, being cause No. 1168, agreeing that said dam should not be constructed at the place called for in the plans and specifications adopted by the decree of the chancery court of Coahoma county as a part of the sys-

tem of improvements for which bonds of said district had been issued and sold; and that said drainage commissioners or their attorney had no power or authority to agree for the construction of a dam some few miles distant from the one in controversy, and in lieu thereof and outside of said drainage district; and that the agreement set forth in the decree in said cause No. 1168 in the chancery court of Quitman county, Mississippi, if carried out, would have greatly lowered the efficiency of the drainage system of said district, and was violative of section 17 of said chapter 269 of Laws of 1914 [Laws 1912, chapter 195, section 17, as amended by Laws 1914, chapter 269, section 12].

"That on the controverted facts in regard to the respective attitudes of the complainants and defendants as to the performance of the terms of the decree in said cause No. 1168 in the chancery court of Quitman county, Mississippi, the complainants are estopped to enforce the said decree; the controverted facts in regard to why said dam at the town of Marks was not constructed not being decided, and all other controverted facts on points not covered in the foregoing findings are also undecided, their decision not being deemed necessary to a disposition of this case.

"That for the past several years the top of the dam in controversy has been used by the traveling public as a public road, and so recognized by the board of supervisors of Quitman county, Mississippi, and that the effect of the issuance of a mandatory writ of injunction in this cause against the defendants for the removal of said dam would be to compel them to destroy said public road, for the time being, and in violation of the law.

"It is therefore ordered, adjudged, and decreed by the court that the complainants are not entitled to the relief prayed for, or to any other relief in the premises, and that the said bill of complaint should be and the same

is hereby dismissed, at the cost of the complainants, and for all of which execution may issue as at law.

"And it is further ordered that the clerk of said court shall, in vacation, enter and record this decree on the minutes of the chancery court of Quitman county, Mississippi."

It will be observed from the decree in this case that the chancellor found, among other things, the following facts: That Cassidy Bayou, at the point where the dam in question is located, is not a running stream, except at flood times, and that the flood waters of Cassidy Bayou above the dam do not, as a result of the ordinary and usual floods from year to year, get sufficiently high to cause damage to appellants' lands.

We will consider first whether the appellee was estopped, by the compromise decree first above set out, rendered in the former suit, from constructing the dam at the place first planned and where it was constructed. As we view the decree in that case, it was nothing more than a contract entered into by the parties, and evidenced on the minutes of the court. In substance, the compromise agreement provided as follows: That the appellants' bill should be dismissed, which was done; that appellants pay the costs of the suit; that appellee should not construct the dam at the site planned, but, in lieu thereof, at a point near the town of Marks, on the west side of the Yazoo & Mississippi Valley Railroad, but upon condition that the appellants should pay appellee any additional cost of the dam above the sum of one thousand two hundred dollars, and should also furnish land for the location and construction of the dam. The chancellor did not decide the question whether the appellants had breached the compromise decree, but held that appellee had no authority, under the law, to agree to a decree providing that the dam should not be constructed at a place other than that provided for in the plans and specifications adopted by the chancery court of Coahoma county

as part of the system of draining the district; that bonds of the district had been issued and sold for that purpose, and that neither appellee, nor its attorneys, had the power under the law to agree to the construction of a dam some miles distant and outside the drainage district, and that the agreement embodied in the consent decree, if carried out, would greatly lower the efficiency of the drainage system of the district, and would also violate section 17, chapter 195, Laws 1912, as amended by section 12 of chapter 269 of the Laws of 1914, under which the district was organized and the bonds therefor issued.

The view we take of this question renders it unnecessary to decide whether the ground upon which the chancellor put his decision be sound or not. As stated, the compromise decree amounted to nothing more than a written contract between the parties, evidenced by the minutes of the chancery court, and we think the evidence was ample to show that the contract was breached by appellants by their failure, after notice, to either furnish the land for the right of way for the dam, or to pay, or tender payment of, any additional cost of its construction above one thousand two hundred dollars. On this question we do not see any substantial conflict in the evidence. The evidence shows that the appellee was without sufficient funds to build the dam at Marks; that, about six months after the consent decree was entered, the appellee's engineer, Fontaine, saw the appellant, W. T. Covington, who had theretofore been the leader of and the most active of the appellants in the former suit, and discussed with him the matter of building the dam, and Covington made no objection to its being built at the original site. The engineer made and had on file with the appellee a detailed estimate of the cost of construction of the dam at the new site, although there were no plans and specifications for its construction on file with the appellee. However, the consent decree did not provide that plans and specifications for the construction at the new

site should be furnished by appellee to the appellants before· the latter were required to furnish a right of way for the dam and necessary funds, above one thousand two hundred dollars, for its completion. Several months before the dam was built, appellee made and entered upon its minutes the following order:

"It is ordered by this board that whereas, a decree was rendered on the 7th day of October, 1920, in the suit of *W. T. Covington et al.* v. *Cassidy Bayou Drainage District et al.,* No. 1168, in the chancery court of Quitman county, Mississippi, in which it was agreed, upon the dismissal of the bill in the above-styled cause, without requiring the plaintiffs to pay any damages therein, that the commissioners of this district would construct a levee and dam across Cassidy Bayou at a point at the town of Marks, Mississippi, near the Coldwater river, on the west side of the Yazoo & Mississippi Valley Railroad Company, upon the condition, however, that the complainants would furnish and pay to the commissioners of this drainage district sufficient money to cover all the costs of the construction of said dam and levee in excess of one thousand two hundred dollars, the said one thousand two hundred dollars to be paid by the commissioners of this district, and the dam and levee to be constructed and built by and under the direction of and at a place satisfactory to the said commissioners and its engineer, E. L. Fontaine. In pursuance of said decree the commissioners of this district and its engineer have long since selected the point at which said dam and levee should be constructed, and located the same at about one hundred yards west of the track of the Yazoo & Mississippi Valley Railroad and parallel with the same, which is at the said town of Marks and near Coldwater river, and that the said engineer has estimated the cost and construction of said dam and placing in the same a flapper valve equipment, so as to allow the water coming down the Cassidy Bayou towards Coldwater river to empty into same when

the flood waters in Coldwater river were lower in Cassidy Bayou; this is to be done in order to protect the landowners in the upper end of Moore's Bayou and Cassidy Bayou. This manner of the construction of said dam was, at the time of the decree rendered herein, agreed upon between the complainants and the defendants. The estimate made of the cost of construction of said dam with said valve equipment is seven thousand dollars.

"The commissioners cannot proceed to build the said dam until the complainants who entered into said agreement have furnished and paid into their hands sufficient money to cover all costs of the construction of the same in excess of one thousand two hundred dollars.

"The commissioners of said drainage district again make demand upon the complainants in said suit, who entered into said agreement, to furnish sufficient money to cover said costs and expenses, and they are hereby notified that, unless they do furnish the said money and pay it into the hands of the said commissioners for said purposes on or before the 1st day of December, A. D. 1922, the said commissioners will proceed to build and erect the dam across Cassidy Bayou which they were enjoined in said suit from building, and the commissioners of this district do hereby instruct their engineer that, upon failure of the said complainants to furnish and pay over the said sum of money into the hands of the commissioners, of this district on or before December 1, 1922, to proceed to let a contract for the building of said dam, from which the commissioners were enjoined from building in said suit, advertisement to be made in the usual way for bids on same.

"It is further ordered that this order be printed by two insertions in the Quitman County Leader, a newspaper published in the town of Marks, Mississippi, and the secretary of this board is hereby directed to mail a copy of this notice to each of said complainants in said suit, if it is possible so to do."

This order was published in the county paper of Quitman county in the issues of November 10 and 17, 1922, and the publisher of the paper mailed to each of the appellants a marked copy of the paper, pointing to the order. The publication was required to be made by another order by appellee entered on its minutes. It will be observed by the terms of the order that the appellants were notified of the cost of the dam to be constructed at Marks, and, we think, of all of the necessary details in regard thereto, and, furthermore, that, if they failed to comply with the obligations they had undertaken in the consent decree on or before December 1, 1922, appellee would proceed to erect the dam at the old site. The evidence showed that the complainants, neither jointly nor singly, took any steps whatever to furnish a right of way for the dam at the site provided for in the consent decree, or to pay the additional cost thereof above one thousand two hundred dollars. It will be observed that the order entered by appellee on its minutes published and mailed to the appellants, recited that the new site for the dam at Marks had been selected, and stated exactly where it was to be built. The published order was not the only notice the appellants had as to the exact location of the new site for the dam and of the cost of its construction. Appellee's engineer talked at various times with several of the appellants, in which conversations they were informed by the engineer as to the location and cost of the dam, and at no time did appellants, or either of them, demand of appellee that plans and specifications for the construction of the dam be prepared by appellee's engineer and put on file, subject to their inspection, nor did the appellants, or either of them, request of appellee that they be furnished with a more detailed statement of the cost of the dam than the statement prepared by appellee's engineer. The appellants stood by, without protest, and saw the dam being constructed at the old site, and then, more than three years after its completion, and

after the cost of its construction had been paid for out of the bonds of the drainage district, appellants brought this suit. We think the record in this case, fairly interpreted, forces the conclusion that the appellants abandoned their original contention that the dam should not be constructed at the old site, and for that reason failed to comply with the conditions embodied in the consent decree upon which the dam was to be constructed at the new site.

The argument that, if the appellants violated the obligations undertaken by them in the consent decree, appellee's remedy therefor was confined to a proper proceeding in that cause to enforce the decree, we think is without merit. The chancery court, in the consent decree, retained no control or authority, either over the subject-matter of the litigation or the parties. On the contrary, the decree expressly dismissed the bill in that cause. By virtue of its dismissal all the parties went out of court. The result was, as hereinbefore stated, that the decree amounted to nothing more than a compromise agreement entered into by the parties and evidenced by the minutes of the court.

We will now consider the question involved in the first suit, which is also involved in the present case, viz.: Whether the rights of appellants, as riparian proprietors, were violated by the construction of the dam at the old site. Appellants contend that Cassidy Bayou is such a natural watercourse as that appellee was without right to obstruct its flow, to their damage, by the construction of the dam. As shown above, the chancellor, in his decree, found that Cassidy Bayou is not a running stream where the dam is located, except in time of flood water; that its office is to carry off the overflow waters of Coldwater river in unusual flood times, and that at such times alone does the dam cause the waters of the bayou to overflow and damage appellants' lands. We think there was ample evidence to support those findings of fact by

the chancellor. Cassidy Bayou is a depression in the land from one hundred fifty to three hundred feet wide; its bed being from three to six feet below the adjacent lands. In flood times there overflows into it waters from Coldwater river. However, during a large part of the year, it dries up into pools and lagoons. Trees, stumps, and other kinds of growth are in it. In other words, it has the characteristics of the usual bayous found in the Delta section of the state.

Mr. Fontaine, a civil engineer, testified that Cassidy Bayou was only a by-pass; that there was a place in the bayou, known as Ox Bow, where the bayou makes a loop of three miles and then comes back to within two hundred fifty feet of its starting point; that it is so filled up in places with drift that very little water can trickle through, thus causing its waters to back up; that the place where the dam is located is slightly higher than the rest of the bayou; that the dam is, therefore, on what might be properly called a "divide;" that, when Coldwater river is not at flood stage, the waters of the bayou flow from the dam eastward into the river, and on the west side of the dam they flow the other way; that, when Coldwater river is at flood stage, its overflow waters back up the bayou until it gets four or five feet deep, and are then pushed over the "divide," and begin to flow westward away from the river; that the overflow waters passing the dam go westward, but they do not get any further than Big creek, on the western edge of the drainage district, where they are stopped by a dam of long-standing drift, and when the river begins to fall the flood waters do not pass on southward, but flow back into the river.

Mr. Ikerd, a nearby landowner, testified that often during flood times he had stood on the bridge across Cassidy Bayou, and found that he could not tell which way the water in it was flowing, except by dropping into it some object that would float. The witness Mr. Fontaine testified that, from the dam to Big creek, some distance

west of the dam, even in flood times, the current of the water in the bayou is hardly perceptible; that it is so slow that, when part of the dam was blown out by dynamite in 1927, it took three days, with the added impulse given it, for the water to get around Ox Bow; that from Marks to the dam, and for several miles further westward to Big creek, the bayou is practically level; that, during the extreme high water of 1927, very little of the flood waters of Coldwater river would have gone through Cassidy Bayou, where the dam is located; that the overflow waters coming out of the river into the bayou become vagrant flood waters, running over a large area of land, and when the flood goes down the water goes back into the river. Mr. Fontaine also testified that, when Coldwater river was at flood stage, its flood waters backing up into Cassidy Bayou, of which the appellants complained, flow west past the dam and on to Big creek, which is at the western edge of the drainage district, and when the river begins to fall it rushes back into Coldwater river. His evidence was corroborated by the evidence of other witnesses.

Putting it in a brief way, appellee's evidence tended to establish the following facts, which were found to be true by the chancellor: That although Cassidy Bayou and its outlets cover a stretch of many miles, the dam where located does not cause the ordinary waters of the bayou to overflow and damage appellants' lands, and that the dam is necessary in order to protect the drainage district from the overflow waters of Coldwater river from occasional, accidental, and extraordinary floods, and the chancellor further found that Cassidy Bayou was not a natural watercourse. The view we take of the question renders it unnecessary to decide whether or not the chancellor was justified in finding that the bayou was not a natural watercourse, for nevertheless *Indian Creek Drainage District* v. *Garrott,* 123 Miss. 301, 85 So. 312, and *Jones* v. *George,* 126 Miss. 576, 89 So. 231, are con-

clusive in favor of appellee's contention. The bayou involved in the Indian Creek Drainage District case was of the same character as Cassidy Bayou. The court held in that case that the drainage district had a right to dam against the overflow waters of Coldwater river in flood times.

*Jones* v. *George,* involved the question of whether a riparian landowner had a right to dam up Burr Bayou against the overflow waters of the Tallahatchie river. Burr Bayou and its outlets are probably fifteen miles in length, and Burr Bayou starts at the bank of the Tallahatchie river. During most of the months of the year it is practically dry, but during flood times the waters of the Tallahatchie river empty into it. At other times, the flow of the surface water from Burr Bayou is into the Tallahatchie river. Burr Bayou has a well-defined channel for some distance from the bank of the river. The court said, among other things:

"It is the law that the free flow of water in rivers secured from undue interruption is an undoubted right of a riparian proprietor. Riparian proprietors are protected from undue interference created by obstruction to this flow. To this rule, however, there is a well-recognized exception, namely, that other proprietors, in case of accidental or extraordinary floods, are entitled to erect such works as will protect them from the consequences of the flood, and that no other riparian owner is entitled to complain of such action upon the ground of injury inflicted thereby, because all as a result of an extraordinary and accidental condition, are entitled to the common right to construct works for their own protection. That this is not only the law in the different states of these United States, but that it is also the law of the European countries is conclusively demonstrated by the masterly opinion of the late Chief Justice WHITE in the case of *Cubbins* v. *Miss. River Com.,* 241 U. S. 351, 36 S. Ct. 671, 60 L. Ed. 1041."

Before our drainage laws were enacted, large areas of the most fertile lands in the state were lying idle. They were swamp and overflowed lands which, if properly drained, would be most productive. An outstanding public policy of this state, as evidenced by our drainage laws, is the reclamation of these swamp and overflowed lands. Under the operation of these laws, many of them, within the last twenty-five years, have been reclaimed and made highly productive. A large part of them is yet unreclaimed, but the probability is that, during the next quarter of a century, practically all of them will be brought into cultivation. In the swamp and overflowed sections of the state there are many bayous. This is especially true of the Delta section. There they may be found on every hand. They only answer the purpose of taking care of flood waters of rivers and creeks and local rains falling near by and into them. They have no sources of their own. They are not fed by other streams, except in flood times. In order to put into practical and useful operation our drainage laws, the 'damming up of bayous of that character is a compelling necessity.

In *Richardson & May* v. *Board of Mississippi Levee Commissioners,* 68 Miss. 539, 9 So. 351, the court said of the levee laws of this state as follows:

"The landowner is not entitled to damages, because of a failure to so place levees as to protect his land from the water of the Mississippi, or because the levee may prevent such water from flowing off as it otherwise would, and may deepen the water in an overflow on the land between the embankment and the river. These are consequences of the situation and the authorized effort to promote the general good by the construction of levees, and must be borne, because they are unavoidable in the nature of things. The legislative scheme is to protect against water from the Mississippi river, by an embankment sufficient for the purpose, and it is to be put where the board intrusted with the execution of the scheme may

determine, and the landowner must submit to any inconvenience or disadvantage or loss resulting to him, consequentially, as his misfortune to be borne for the general good to which individual convenience must be subordinated, except where it is otherwise provided.''

*Affirmed.*

ETHRIDGE, J. (dissenting).

I am unable to agree with the views expressed by Judge ANDERSON. I do not understand the facts, in all respects, as he does, and it will be necessary to write a statement of the controlling facts as I get them from the record, although we do not radically differ in the main.

In 1914 Cassidy Bayou drainage district, appellee herein, was organized under the provision of chapter 195, Laws of 1912, as amended by the Laws of 1914, chapter 269. Among the plans for the protection of the territory embraced in the drainage district was the construction of a dam across Cassidy Bayou, southwest of Belen, Miss., at which point Moore's Bayou joins Cassidy's Bayou. Cassidy Bayou is a stream into which water flows the greater part of the year, having a definite channel and banks. Moore's Bayou extends northwest from Belen for a distance of about twenty miles and drains a large territory; several minor Delta streams of various names flowing into it. In ordinary stages water flows through Moore's and Cassidy Bayou, into the Coldwater river, at or near Marks, Miss.; but when the water in Cassidy Bayou becomes from three to four feet deep, it then flows in a westerly or southerly direction, and finally empties into the Tallahatchie river about eighty miles southwest by way of the Bayou, but a considerable shorter distance on a direct line from Marks. Cassidy Bayou is a flat stream, and the water flowing therein is sluggish. The fall from Marks to Belen is only about six-tenths of a foot, the distance of the river's meandering being about

twelve or fourteen miles, and approximately half that distance in a direct line. The fall from Belen to where the dam was constructed is about six-tenths of a foot, making the water level at Marks and at the site of the dam approximately the same. Beyond the site where the dam was planned, toward the south to Big creek, a part of Cassidy Bayou, a distance of six or seven miles, there is a fall of about eighteen inches. Big creek is really a lake three and one-half miles long, constituting a part of the watercourse of Cassidy Bayou. From Big creek to the Mark Ham place there is a considerable fall.

When the plans of the Cassidy Bayou drainage district were filed, and it was created, certain property owners living outside of the drainage district between the proposed dam and the mouth of Cassidy Bayou, where it empties into Coldwater river, and also property owners along Moore's Bayou, filed a bill to enjoin the damming of the stream, alleging that it was a running stream and watercourse, and the natural drainage for their lands, and that if such dam was constructed their land would be injured by the high waters of Coldwater river, and by the waters following an excessive period of rainfall in the territory drained by Moore's Bayou and other streams emptying into it. The injunction was granted upon the bill, and nothing was done about constructing the dam until the decision of this court in the *Indian Creek Drainage District case,* reported in 123 Miss. 301, 85 So. 312, when the drainage district took steps to ·bring the cause to a hearing in the chancery court.· Some testimony was taken in the suit by agreement, and a consent decree was entered, reading as set out in Judge ANDERSON's opinion.

After the entry of this decree or order, the engineer went to Marks, Miss., and inspected Cassidy Bayou and the territory there, with a view to locating the dam in accordance with the decree or order. He made observations and picked out a place where he thought the dam

could best be constructed with a flapper valve attachment, by and through which valve water, in low stages, would drain into Coldwater river, and when such river began to rise, and reached a certain height, this valve would automatically close, confining the waters of that river within its banks. The engineer made an estimate of the cost of constructing the dam, and had conversations with certain of the complainants (the appellants) with reference thereto, with a view to getting them to put up the money to construct the dam at that point in accordance with the decree or order. The engineer's testimony is to the effect that he could get no satisfaction out of the parties with whom he was talking; that they simply would not talk about the proposition; while polite, they would commit themselves to nothing.

The engineer reported to the board of drainage commissioners that, in his judgment, it would require approximately seven thousand dollars to construct the dam at Marks, but no plans and specifications were made and filed with the board, or served upon the complainants in the original bill. A notice was published, however, in the county paper having circulation in Marks and the adjacent territory, stating that the engineer had estimated the cost of the dam, with the flapper valve attachment, at seven thousand dollars, and that the drainage commissioners called upon the complainants in the original suit to pay over to the commissioners the money required by this estimate. Copies of this notice were directed to be mailed to each of the complainants, but the notice, instead of being signed by the Cassidy Bayou drainage district was signed, "Harris, Drainage District."

The complainants not paying in the money as directed by this notice, the Cassidy Bayou drainage district commissioners proceeded to construct the dam at the site originally selected by them, covered by the injunction in the former suit, and the dam was placed in Cassidy Bayou at the original point, without any further proceeding in

court. It appears that, after the beginning of the construction of this dam, there was some conversation between the engineer in charge of the construction and one of the complainants, Mr. Covington, in which the complainant expressed the view that it would be satisfactory to the complainants if the drainage commission would place the flapper valve attachment in the stream at a certain height. Work on the dam progressed and the valve was placed therein, but in front of it was a brick wall of a certain height. Afterwards the wall and valve were taken out and the dam made solid.

There was also a suit between the Cassidy Bayou drainage district and the board of supervisors of Quitman county over this dam, the board desiring a bridge to be constructed at that point and the dam removed, but the dam had been completed and a public road constructed over the top of it in lieu of the bridge. The complainants here were not parties to that suit, but the board of supervisors in that suit were perpetually enjoined from interfering with the dam as constructed. Some time after the construction of this dam, and before the present suit was instituted, the dam was dynamited during high water, and the water flowed through the crevasse in the dam for several hours, falling several inches below the level maintained above the dam before it was dynamited.

The present suit was instituted by the original complainants in the former suit, with the exception of P. B. M. Self. Mr. Self's land lay across Coldwater river from the mouth of Cassidy Bayou, and was not directly affected. He did not join in the last suit, preferring to take his own course in the matter. The present suit was filed, setting up the history of the transaction as above stated, and making the proceedings in the original suit, including all the pleadings and the consent decree above referred to, exhibits thereto, and the cause came on for hearing on bill, answer, and proof. The chancellor, after

hearing such cause, dismissed the present bill, here appealed from, permitting the dam to remain in Cassidy Bayou.

The complainants appealed from that decree to this court, contending that the consent decree precluded the drainage district from erecting the dam in the stream; that such district was not authorized to disregard that decree, but should have constructed the dam at the point selected near Marks, and then called upon them to pay the cost thereof; or that the commissioners of such district should have filed its plans and specifications, and estimate of materials, and of the cost of labor, and served the same upon the complainants; or that it should have proceeded by proper application to have the decree set aside for noncompliance, in which event they should have notice of, and hearing on, all pertinent matters in such suit. Complainants further contended that, if mistaken in this, still the decree of the court below was erroneous and wrongful, and should have been rendered for the complainants upon the proof in the case.

I think the first decree set out in Judge ANDERSON's opinion was a valid decree, binding on the parties to it in all respects. The court certainly had jurisdiction of the subject-matter of the litigation, and the judge who originally sat in the case, and all of the attorneys therein, believed at the time that the court had jurisdiction to enter this decree, and there was no appeal from it; consequently it should have been treated as a final decree. That being true, it would be necessary to attack and set it aside by a bill of review, or by a bill for a fraud, or by an original bill setting up the nonperformance of the conditions by the appellants here, and having the court to set it aside, rather than ignore it. The first decree starts out by reciting: ''Came on this cause this day for hearing and came all of the parties, complainant and defendant, by their solicitors, and a part of the evidence being taken and heard, all of the parties herein in open

court by their solicitors agreed upon a settlement of this suit as follows''—reciting the conditions upon which the suit was to be settled.

The bill was not dismissed, except on the condition that the various provisions be considered a decree and binding upon the parties. Under this decree it was necessary for the drainage district and its engineer to furnish the complainants with plans and specifications of the proposed flapper dam to be constructed at Marks. It provided that the location and construction of the said levee and dam, and the right of way for the same, was to be furnished by the complainant, and it was further provided that the complainants shall furnish and pay the defendant all of the cost of this project in excess of one thousand two hundred dollars, for the construction of the levee and dam across the said bayou at Marks, *in accordance with such plans and specifications as the said commissioner and engineer shall provide*, and, if necessary, pay for the land and right of way to close the bayou, as a location for the levee and dam, *and furnish the necessary material for the construction of the said dam and levy*. It was also provided that the dam should not be built at the original site, nor any other dam or levee across Cassidy Bayou, except as herein stipulated.

It will be seen from the recital of this decree that the complainants were to furnish the material for the construction of the flapper dam, and to buy the right of way and pay for the material used in constructing the dam in accordance with such plans and specifications as the drainage commissioners and the engineers shall provide. The complainants were not to turn over to the drainage commissioners or engineer such sum of money as they should call for, but should furnish such material and buy such right of way as the plans and the specifications provided called for. They were to pay such expenses in excess of one thousand two hundred dollars.

There is no proof in the record that any plans and specifications were filed anywhere, or that any complainant ever had notice that any were on file, or where they could be inspected. It is certainly not a reasonable construction of this decree to say that the parties must pay any sum of money called for by the engineer on a mere guess, or on his mere opinion about the amount needed. They were entitled to have the plans and specifications filed, so that they could see whether or not such plans and specifications were fair and reasonable, and were themselves to buy the materials called for in the market. There is nothing to show that the dam at that point, properly constructed to serve the purpose for which it was intended, would have cost the amount called for. There is only the statement of the engineer that in his estimation it would take that much.

When we take this statement into consideration, with the fact that the dam actually constructed only cost about two thousand dollars, and that it was built to a height of twelve feet, it does not appear probable that it would have cost seven thousand dollars, or anything like it. The complainants certainly had a right, before being called on to pay the money, to have the plans and specifications prepared and filed, so they could know what materials were necessary, and what the reasonable cost of the dam would be. They were, of course, not bound by the estimate of the engineer—there was nothing in the decree so providing; but they were only required to furnish what was actually necessary to construct a reasonable and proper dam at the point designated.

The complainants had an injunction in force at the time the agreed decree was entered, prohibiting the construction of the dam at the point where it was later constructed. If the court did not have jurisdiction to enter the decree, then the injunction would still be pending and in force, and the drainage commissioners could not ignore it, and substitute their own judgment as to wheth-

er the contract had been breached, for that of the court. The complainants were entitled to a hearing, and the judgment of the court as to whether or not the contract had been breached.

It is a strange doctrine that a decree shall operate to dismiss a bill and get rid of an injunction, when it is not operative for any other purpose, and especially where it is provided in the most positive terms that the dam should not be constructed across Cassidy Bayou at the point where it was built, or at any other point than that stipulated in the decree.

I do not agree with the statement in the opinion that the dam constructed at Marks as provided in the first decree would not have been effective as protective for the district. In fact, it would have protected all the territory lying along Cassidy and Moore's Bayous, and both complainants and defendants would have been fully protected from flood waters by the construction of the dam at Marks, in accordance with the stipulation. I know of nothing that will preclude the commissioners from constructing the dam at that point, and they certainly had the power to consent to the decree that was entered in the cause.

It is true that the chancellor, in his final decree, recites that Cassidy Bayou, at the point where the dam in controversy is located, is not a running stream, except at the time of flood waters; but there is no testimony which can fairly be held to support this finding of facts. Cassidy Bayou, in fact, was a running stream throughout almost the entire year. Moore's Bayou was a large bayou, which emptied into Cassidy Bayou; and when Coldwater river was at low stage, water from these bayous ran into that river from a point where Moore's Bayou intersected Cassidy Bayou. These streams drain something like twenty thousand acres of land. They not only ran into Coldwater river, but, when the water is over three feet deep in Cassidy Bayou, it runs in a southwest-

erly direction, and empties into the Tallahatchie river; and the lower reaches of Cassidy Bayou, towards said river, never become dry, while the part of the stream from the dam to Coldwater river only dries up in extremely dry weather. Numerous witnesses testify to this fact. Some of the witnesses tried to leave the impression that it is not a constantly running stream, and this is true in an extremely dry season; but the bed of the bayou never is entirely dry. It sometimes dries up in the fall, but there is running water a large part of the year.

It is true that a witness testified that at the place where the dam was built, or near that point, it was difficult to see which way the waters flowed by merely observing it. That is due to the level character of the country. The proof shows that the bed of the bayou is practically on a level from the Coldwater river to the dam. It does not vary in that distance of fourteen miles more than one and one-fourth inches. To the south of the dam the fall is greater. The stream has a well-defined bed and banks, and is a rather large bayou. When the water, whether from local causes or from a rise in the river, is over three feet deep, it flows to the south, emptying, as above stated, into the Tallahatchie river. Not only do these streams carry off the flood waters, but they serve as natural drainage for the local rainfall.

The proof shows that the real reason the agreement was not complied with (in my opinion) was that the drainage commissioners, after the decree was entered, discovered that another drainage district lying north of this district had been created, known as Deep Bayou, and into it certain other streams emptied, all finally flowing into Cassidy Bayou.

The notice given, set forth in Judge ANDERSON's opinion, to the complainants to pay over the sum of seven thousand dollars, was not signed by the Cassidy Bayou drainage district commissioners, but was signed by another drainage district's commissioners. This notice,

however, did not anywhere state that there were any plans or specifications filed, to be inspected, or any which could be inspected, for the purpose of determining whether the estimates were correct, and just what materials and money would be needed.

I have carefully re-read the engineer's testimony, and, taking it as a whole, and giving it a fair construction, it does not, in my judgment, warrant the conclusion that Cassidy Bayou was not a running stream. Practically all streams in the Delta are flat and shallow. In other words, the water is sluggish, and the banks are not high. Cassidy Bayou, from Coldwater river to where is empties into the Tallahatchie river, is continuously a stream in which water flows practically all the year—certainly a large part of the year.

I think the proof shows conclusively that Cassidy Bayou is a running stream; that the property owners abutting thereon and on Moore's Bayou—which drains into Cassidy Bayou—are entitled to have this stream remain as it has been from time immemorial; and that this conclusion is not affected by the cases of *Indian Creek Dist.* v. *Garrott,* 123 Miss. 301, 85 So. 312, and *Jones* v. *George,* 126 Miss. 576, 89 So. 231, relied upon by the appellee, the Cassidy Bayou drainage district. These cases do not overrule *Ferris* v. *Wellborn,* 64 Miss. 29, 8 So. 165, nor *Belzoni Drainage Dist. Commission* v. *Winn,* 98 Miss. 359, 53 So. 778. The case of *Ferris* v. *Wellborn, supra,* was decided in October, 1886. The opinion is short, and defines a water course. The court, speaking through Judge CAMPBELL, said:

"The proof is that Prairie creek is a natural channel, one-half or three-fourths of a mile long, with defined bed and banks, of varying width and depth, through which water is conveyed and discharged into the low land adjacent to Plum creek. It is undoubtedly a watercourse whenever there is water to run in it, and the fact that it is most of the time dry or not running is not enough to

deprive it of the character of a water course, with its incidents, among which is the right of the riparian owner to have it remain as nature made it as a drain for the adjacent land.''

The Belzoni Drainage District case cites this definition and approved it. In the case before us, Cassidy Bayou is a running stream, except in extremely dry seasons. It drains the rainfall, springs, and seepage from a large territory and has all of the essentials of a watercourse. It is a stream eighty to ninety miles in length, according to its meanderings, and drains an important watershed. Originally this bayou drained a large territory northwest of Belen, extending from twenty to thirty miles to Jonestown, on Moore's Bayou; other streams from the north emptying into it. Some years before the present suit arose, another drainage project was laid out from Swan Lake through certain territory to Sunflower river, and some of the waters flowing into Moore's Bayou were diverted and carried into Sunflower river. The waters drained by Cassidy Bayou and Moore's Bayou are not merely vagrant flood waters, or overflow waters from the Coldwater river, but, as stated above, Cassidy Bayou drains a large territory of rainfall, spring seepage and other sources of flowage.

In *Leflore County* v. *Cannon,* 81 Miss. 334, 3 So. 81, the court said: '' '*Aqua currit et debet currere ut currere solebat'* is a maxim as old as the common law on waters. This record shows that the board was about to dam up a stream known as 'Burr Bayou,' where the water, left alone, would run as it ought to run, and was used to run from time immemorial. By this dam irreparable injury would have been inflicted, as the bill charges and the demurrer admits, on the complainants. Under our Constitution and laws, neither municipalities, nor counties, nor the sovereign state itself can damage the humblest individual, in violation of the maxim, except in the lawful exercise of the right of eminent domain, and then not

without previous compensation ascertained by lawful methods. This is true, regardless of the benefit to the public at large."

The court, in the case of *Indian Creek Drainage Dist.* v. *Garrott*, 123 Miss. 301, 85 So. 312, said: "*The Cannon and Garrier cases* [103 Miss. 324, 60 So. 326], *supra*, come nearest to being in point for appellees, but we have discussed these cases in the light that they were not dealing with the question of defending against vagrant flood waters."

It will be seen from this opinion that the court did not intend to disturb the rule announced in that case, but merely held that it was not applicable to the controversy then before the court, which dealt entirely with vagrant flood water. The theory of both the case of *Indian Creek Drainage Dist.* v. *Garrott*, and of *Jones* v. *George, supra*, was to enable landowners to fight vagrant flood waters and overflow waters by confining the waters within the stream or within circumscribed limits, in order to protect their land from such overflow. In *Jones* v. *George, supra*, it was held, in the third syllabus, that "A riparian proprietor is entitled to the free flow of water in rivers secured from undue interruption," and in the fourth syllabus that "a riparian proprietor or drainage district is entitled to erect levees or such other works as will protect its lands from the accidental or extraordinary flood waters of a stream. No other riparian owner can complain of this action because of injury thereby inflicted upon him."

At page 583 of 126 Miss. (89 So. 233) the court said: "It is the law that the free flow of water in rivers secured from undue interruption is an undoubted right of a riparian proprietor. Riparian proprietors are protected from undue interference created by obstruction to this flow. To this rule, however, there is a well-recognized exception, namely, that other proprietors, in case of accidental or extraordinary floods, are entitled to erect such

works as will protect them from the consequences of the flood, and that no other riparian owner is entitled to complain of such action upon the ground of injury inflicted thereby, because all, as a result of an extraordinary and accidental condition, are entitled to the common right to construct works for their own protection. That this is not only the law in the different states of these United States, but that it is also the law of the European countries, is conclusively demonstrated by the masterly opinion of the late Chief Justice WHITE in the case of *Cubbins* v. *Mississippi River Com.*, 241 U. S. 351, 36 S. Ct. 671, 60 L. Ed. 1041.''

It will be seen from a careful reading of these opinions that it was extraordinary flood waters or vagrant waters with which the court was dealing, and that it was not the intention of the court to overrule the cases of *Ferris* v. *Wellborn* and *Leflore County* v. *Cannon, supra.* The facts dealt with in the cases of *Indian Creek Drainage Dist.* v. *Garrott* and *Jones* v. *George, supra,* are not such as are dealt with in the instant case. If the drainage district, or any other organization, were permitted to dam up the channel of running streams, and turn back the waters upon the abutting property owners on the upper reaches of the stream, great injury would result therefrom, with but little benefit. The drainage district and the abutting property owners may do what is reasonable to confine the flood waters within the banks of the stream, and to prevent their escaping and overflowing their lands; but the drainage laws do not contemplate the obstruction and damming up of streams with well-defined beds and banks, through which water flows, as a watercourse, a considerable portion of the year. Channels of streams may be straightened, deepened, and widened in appropriate cases, but they are not to be completely filled up so as to prevent water flowing according to its immemorial custom.

It is contended that the proof does not show damage. I am unable to agree with this point of view—the proof does show, conclusively, that the water was backed up over the lands of the adjacent owners in amounts and places not subject theretofore to overflow, when the dam was not in Cassidy Bayou. The abutting property owners are entitled to have this stream continued as an open, flowing stream. This is a valuable right, and damage would necessarily and logically follow their being deprived of it.