CLEVELAND, CINCINNATI, CHICAGO & ST. LOUIS RAILWAY COMPANY ET AL. *v.* MUMFORD ET AL.

[No. 25,356.   Filed October 24, 1935.]

658

John D. Welman, L. E. Jeffries, S. R. Prince, Frank L. Littleton, Edward C. Craig, Robinson & Stilwell, Thomas Duncan, P. J. Kolb, Charles A. Steele, Roberta S. Watts, and Harvey Harmon, for appellants.

Henry Kister and Morton C. Embree, for appellees.

FANSLER, J.—This is an appeal from a judgment establishing a levee in Gibson and Posey counties, under sections 9573 to 9587, inclusive, Burns 1926. The proceedings involve about 60,000 acres of land affected by the overflow of the Wabash, White, and Patoka rivers. The appellant railroads maintain tracks constructed on embankments and bridges across the Wabash river in the affected area. The other appellants are affected landowners.

The original petition was referred to drainage commissioners, who filed a preliminary report conforming to the statute, against which no remonstrances were filed. It was referred back to the commissioners, who, after an extension of time, filed what is denominated in the briefs as the "first final report." To this final report the appellants and many others filed remonstrances, alleging as a ground therefor, among other things, that the location of the work is not such as will secure the best results. Thereupon the petitioners filed the following written motion:

"The petitioners in the above-entitled cause respectfully move the court to set aside the report of the commissioners in said cause and refer the matter again to said commissioners for a new report for the purpose of changing the estimate of cost contained in said report, making changes in the assessments of benefits and damages therein set forth, changing the specifications for said work and making such other changes therein as the commissioners shall deem advisable, with a view to the elimination of the diversion channel therein specified if, in the opinion of such commissioners, the same may be eliminated; and the petitioners now confess that the method of the work as set out in said final report is not such as will secure the best results, as is charged in the third specification of the remonstrance of John M. Blood, filed in this proceeding on the 25th day of August, 1921."

Over the objection of appellants, the court sustained the motion to set aside the report of the commissioners, and referred the same again to the commissioners for a new report. This action was taken without a hearing, of which appellants complain, asserting that they had a right to a hearing upon their other statutory grounds of remonstrance. The statute provides that, if upon hearing it be decided that the first or second named causes of remonstrance (First. That the report is not made according to law. Second. That the location of the levee or the method of the work is not according to law or is not such as will secure the best results.) be true, the court may set aside the report, and refer the matter again to the commissioners for a new report. It is true that there was no hearing, but all of the appellants who are complaining had asserted that the improvement as reported was not such as would secure the best results, and the

petitioners had admitted as much to be true. This having been conceded by the parties in interest, it was not necessary that the court conduct a hearing to determine the fact, and, since the matter was to be referred back to the commissioners for a new report, no good purpose would have been accomplished in hearing the remonstrators upon their other grounds of remonstrance, since they might be, and probably would be, affected differently by the work as proposed in a new report. We find no error in the court's action in this respect. No action seems to have been taken by the court upon that part of the motion which asks that the report be referred back for the purpose of changing the estimate of cost, making changes in the assessment of benefits and damages, and changing the specifications.

Thereafter what is denominated the "new final report" was filed, proposing a different method of constructing the work and estimating the cost at less than $1,200,000, as against $3,500,000 under the first report. To this final report the appellants all filed remonstrances containing substantially all of the statutory grounds of remonstrance.

The cause was submitted and tried, the trial occupying more than 100 days. Thereafter 839 special findings of fact and 151 conclusions of law were filed, to each of which at least some of the appellants excepted. There was judgment to the effect that the rights of way of all of the appellant railroads were benefited in amounts ranging from $52,500 to $77,500, and that those appellants were not damaged to any extent whatever. The appellants' several motions for a new trial were overruled.

Appellants contend that the court had no jurisdiction to order the construction of the improvement in

question for the reason that "the Wabash river at, in and near the proposed levee district is a navigable water of the United States and none can build any bridge across the river or place any obstruction of any kind or nature in the bed of the river without an affirmative act of Congress of the United States." No act of Congress was shown to have been procured. A federal statute provides:

"That it shall not be lawful to construct or commence the construction of any bridge, dam, dike, or causeway over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States until the consent of Congress to the building of such structures shall have been obtained and until the plans for the same shall have been submitted to and approved by the chief of engineers and by the secretary of war: Provided, that such structures may be built under authority of the legislature of a state across rivers and other waterways the navigable portions of which lie wholly within the limits of a single state, provided the location and plans thereof are submitted to and approved by the chief of engineers and by the secretary of war before construction is commenced: And provided further, That when plans for any bridge or other structure have been approved by the chief of engineers and by the secretary of war, it shall not be lawful to deviate from such plans either before or after completion of the structure unless the modification of said plans has previously been submitted to and received the approval of the chief of engineers and of the secretary of war." Vol. 30, U. S. Stat. at Large, ch. 425, p. 1151, §9.

"That the creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is hereby

prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the chief of engineers and authorized by the secretary of war; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the chief of engineers and authorized by the secretary of war prior to beginning the same." Vol. 30, U. S. Stat. at large, ch. 425, p. 1151, §10.

Appellants contend that the Wabash river extends to the highest floodwater boundaries in the valley; that all of the valley which is covered by water in times of flood is part of the navigable stream, and that therefore, before any levee or other obstruction can be built in any part of the valley which is submerged in times of flood or high water, authority of Congress must be procured. Appellees, on the contrary, contend that the natural banks of the river are the limits of the navigable stream, and that the valley into which it occasionally overflows is not part of the stream, and that levees, dikes, and other structures may be built therein without authority of Congress.

It is well known that the Wabash and other rivers of Indiana have at certain times overflowed their banks and inundated many miles of farm land and parts of cities and towns. It is inconceivable that the federal

statutes above referred to ·were intended to vest in Congress jurisdiction to determine whether or not structures which would tend to impair the flow of water might be constructed upon any of the land which was inundated by the floods of 1913. Such a construction would preclude the erection of homes, business buildings, and even public buildings, in many cities, upon land that no one has ever dreamed of considering part of a river bed. This is clearly beyond the obvious purposes of the legislation.

In *Cubbins* v. *Mississippi River Commission* (1916), 241 U. S. 351, 36 Sup. Ct. Rep. 671, the appellant questioned the right of the public to construct levees outside the natural and ordinary channel of the river, but within the valley which was overflowed by the waters of the river in times of flood. It is pointed out in a learned opinion by Chief Justice White that the right to an unrestricted flow of rivers and streams is qualified by a limitation permitting structures for the control of accidental and extraordinary floods; that the possibility of overflows does not prevent their being accidental. It is said on page 367: ". . . it is obvious from the situation and the causes which in the nature of things may accidentally bring about the emptying into the river at one and the same time of the volumes of water from all the vast sources of supply which drain the expansive watershed into the river, in the absence of which accidental unison there could be no flood, that the accidental character of the unity of the conditions upon which the flood depends serves to affix that character to the result—the flood itself. But assuming, as we think it must be assumed, that the words accidental and extraordinary are to be taken as relating to the river, that is, as alone embracing conditions not usually there occurring and not ordinary

to the stream in its usual condition having regard to the flow through its natural bed, whether in high or low water, that view would be here irrelevant, since there is no suggestion of any bed of the river in high or low water except the space between the natural banks along which the levees were built unless the whole valley be considered as such bed. Indeed from the face of the bill it is apparent that the rights relied upon were assumed to exist upon the theory that the valley through which the river travels, in all its length and vast expanse, with its great population, its farms, its villages, its towns, its cities, its schools, its colleges, its universities, its manufactories, its network of railroads—some of them transcontinental, are virtually to be considered from a legal point of view as constituting merely the high water bed of the river and therefore subject, without any power to protect, to be submitted to the destruction resulting from the overflow by the river of its natural banks."

It was concluded that the property in the valley outside of the normal bed of the stream is not a part of the bed of the river, and that hence construction of a levee in such valley lands to deflect "accidental" water does not constitute an interference with the stream or its natural flow.

The channels of navigable streams are reserved to the United States, but the lands outside the ordinary banks of the river over which flood waters may flow are privately owned; some at least of those in the case at bar were expressly granted to the State of Indiana by the United States as swamp land, with authority to drain and redeem and sell to private owners. Such lands inundated at high water cannot rationally be considered as part of the bed of a navigable stream, not-

withstanding the water which flows over them is part of the waters of the stream.

The statute by which the lands affected were granted to the State of Indiana was enacted to enable the states "to construct the necessary levees and drains, to reclaim the swamp and overflowed lands therein." R. S. of the United States, 1878, p. 543, §2479; Barnes Federal Code, 1919, §4284.

Clearly the words "overflowed lands" refer to lands overflowed by the excess water of streams in time of flood, and the protection of such lands from an overflow "was not only not forbidden, but was recognized as the duty of the state, in consideration of the grant of the public lands." *Leovy* v. *United States* (1900), 177 U. S. 621, 19 Sup. Ct. Rep. 885. The word "overflow" has a well-recognized meaning. It is universally understood that a river has overflowed when water has accumulated to such an extent that it leaves its regular and ordinary banks and is discharged over lands that are not thought of or considered a part of the bed of the stream. Since Congress has not only authorized, but has made, grants to the states for the purpose of enabling them to protect lands from such overflow, the statutes forbidding obstructions to navigable streams must be construed in the light of the prior legislation and the manifest purpose of the latter legislation, which is to protect commerce and navigation, and thus considered it is obvious that the purpose of the act is to protect that part of the ordinary bed of the stream which has been or may be used for navigation, and that its purpose was not to prevent the states from protecting adjacent lands from overflow. Such a construction is entirely consistent with the reasoning of the Supreme Court of the United States in the case

last cited. The cases which have come to our attention which contain language which might seem to be inconsistent with our conclusion all involve structures which affect the channel of the stream itself, and therefore are to be distinguished.

The appellant railroads contend that the court erred in refusing to allow them as damages the amounts which they will be required to expend in raising the grade of their railroads, which will be made necessary by the construction of the levee, and in raising their bridges across the rivers, which they contend, and offered to prove, will be made necessary by the additional volume of water which will be thrown into the channel of the river and the land between the levee and the river proper. It is well settled that a railroad acquires its right of way, whether in fee or by easement, subject to the right of the state to intersect it with public drains as well as public highways, and subject to the condition that it must maintain its road across such structures at its own expense so as not to impair their usefulness. It is not important whether the structures were established before or after the railroad is built. Having accepted privileges and franchises from the state under such conditions, it is not entitled to compensation for interruption, inconvenience, or expense occasioned by conforming its way to the requirements of new public structures. This is the common-law rule. *Chicago & E. R. R.* v. *Luddington* (1910), 175 Ind. 35, 91 N. E. 939, 93 N. E. 273; *Click* v. *Arnold* (1926), 197 Ind. 350, 149 N. E. 178; *Chicago, B. & Q. R. Co.* v. *Illinois ex rel. Drainage Com'rs.* (1906), 200 U. S. 561, 26 S. Ct. Rep. 341.

Railroads are required to construct or reconstruct their bridges over drainage ditches, although their prop-

erties are not benefited and are not within the area under drain. *Lake Shore & M. S. Ry.* v. *Clough* (1914), 182 Ind. 178, 104 N. E. 975, 105 N. E. 905. Affirmed, 242 U. S. 375.

But it is contended by the appellant railroads that this rule does not apply to the construction of levees. Public drains are designed to take water off of lands. In many cases the lands to be benefited are not always inundated, but only at times of high water. Levees are constructed to keep overflow water off of lands in times of high water. The purpose to be accomplished is the same. It is merely accomplished by a different engineering method. The result of the construction of a drainage ditch or of a levee is to increase the burden upon some stream or waterway by throwing more water into it, or by throwing the same amount of water more rapidly; that is, more water at a given time. Both are designed to serve a public purpose, the drainage of land, and it is well recognized as within the power of the state to accomplish such purposes in affected areas, and that when established under statutory enactment they are public enterprises.

The construction of highways, drains, levees, and like improvements involves an exercise of the police power, affected though it may be by other powers. The police power cannot be surrendered, nor was it intended that it be surrendered, in the granting of franchises and the right of eminent domain to railroads.

In the case of *Chicago, B. & Q. R. Co.* v. *Illinois ex rel. Drainage Com'rs., supra,* the improvement contemplated a combined system of drainage and protection from wash or overflow, and involved the widening and deepening of, and an increase in the amount of water that would flow through, a natural water course over

which the railroad company had theretofore constructed a bridge. It is said in the opinion (p. 585) : "But the railway company, in effect, if not in words, insists that the rights which it asserts in this case are superior and paramount to any that the public has to use the water course in question for the purpose of draining the lands in its vicinity, although such water course was in existence, for the benefit of the public, long before the railway company constructed its bridge. This contention cannot, however, be sustained, except upon the theory that the acquisition by the railway company of a right of way through the lands in question, and the construction on that right of way of a bridge across Rob Roy creek at the point in question, carried with it a surrender by the state of its power, by appropriate agencies, to provide for such use of that natural water course as might subsequently become necessary or proper for the public interests. If the state could part with such power, held in trust for the public—which is by no means admitted—it has not done so in any statute, either by express words or by necessary implication. When the railway company laid the foundations of its bridge in Rob Roy creek, it did so subject to the rights of the public in the use of that water course, and also subject to the possibility that new circumstances and future public necessities might, in the judgment of the state, reasonably require a material change in the methods used in crossing the creek with cars. It may be—and we take it to be true—that the opening under the bridge as originally constructed was sufficient to pass all the water then or now flowing through the creek. But the duty of the company, implied in law, was to maintain an opening under the bridge that would be adequate and effectual for such an increase in the volume of water as might result

from lawful, reasonable regulations established by appropriate public authority from time to time for the drainage of lands on either side of the creek. Angell, Water Courses, 6th ed., 640, §465b.''

This burden upon the railroad is not confined to conforming to the changes of natural water courses, but includes a duty to conform to new or artificial public structures required for drainage in the public interest. *Lake Erie & W. R. R.* v. *Shelley* (1904), 163 Ind. 36, 71 N. E. 151. And we see no reason why the principles involved do not apply to levees as well as highways and drains.

Appellants rely upon the sections of the statute providing for the assessment of benefits and damages ''to each separate tract of land to be affected, or any interest therein, and to easements held by railroad and other corporations.'' It is contended that the state prefers to pay for damages to the right of way of railroads, and that this the legislature had the right to do. Construing clauses to the same effect occurring in the drainage law, this court held in *Chicago & E. R. R.* v. *Luddington, supra,* that the statute did not repeal the common law upon the subject, and that the railroad was not entitled to damages by virtue of the statute. The same reasoning applies here. It is also contended by the appellant railroads that, since their bridges across the Wabash river were built under a permissive act of Congress, they have a vested property right therein which entitles them to damages. This contention cannot be sustained. The purpose of the requirement that navigable streams cannot be bridged without the consent of Congress is to protect the waterways and to prevent their impairment as navigable streams, and such legislation was not intended to, nor does it, interfere with or limit the police power of the

state so long as in the exercise of that power the state does not interfere with the navigability of streams.

It is conceded that railroads may be assessed for the construction of drainage projects because of benefits to their right of way. But their right of way, like other property, may not be assessed as benefited unless it is specially benefited, that is, received some benefit in addition to that which accrues to the community generally. Whether property is specially benefited by an improvement is a question of fact to be determined from the evidence. *Watson* v. *Armstrong* (1913), 180 Ind. 49, 102 N. E. 273.

Benefits are special when they increase the value of the property, relieve it from a burden, or make it especially adapted to a purpose which enhances its value. *Lipes* v. *Hand* (1886), 104 Ind. 503, 508, 1 N. E. 871, 4 N. E. 160, and cases cited.

It has been held that if the effect of the construction of a drain is to reduce the volume of water and to permit the railroad to maintain a smaller bridge or opening, or to obviate the necessity of an additional bridge, this may be the basis of an assessment of benefits. *Pittsburgh, C. C. & St. L. Ry.* v. *Machler* (1902), 158 Ind. 159, 63 N. E. 210; *Drainage Com'rs., etc.* v. *Illinois Cent. R. R.* (1895), 158 Ill. 353, 41 N. E. 1073.

The court found that the roadbeds and right of way of the appellant railroads will be benefited and that they will be made safer for the operation of trains; that operating efficiency will be increased and maintenance costs will be diminished on that part of the right of way outside the levee. It was found that, as at present. constructed, this part of the right of way consists of trestles and embankments; that by the construction of the levee it will be protected to such an extent that much of the openings under the trestles will not be required.

Evidence was offered tending to show that the railroads will be required to change their structures between the levee and the river because of the admitted and obvious fact that by the construction of the levee the entire waters of the district will come in contact with their roadbed and right of way and appurtenances in a narrower channel, which will cause either deeper water or a faster flow or both within the restricted area. The court refused to consider such evidence, and assessed benefits against the railroads upon the theory that they are chargeable as benefited to the extent of any saving occasioned by lesser maintenance costs upon that part of their right of way in the affected area outside of the levee, without giving any consideration to the fact that some of these costs might not, in fact, be saved, but merely be transferred to the part of their right of way between the levee and the river. If it is assumed that before the construction of the levee the railroads maintained their grades and embankments, interspersed with trestles to permit the passage of water, across the entire affected area, and to the bank of the river, at an annual expense of $10,000 for maintenance; that the levee will intersect the right of way in the affected area, dividing it in half; that as a result of the construction of the levee the water will be taken entirely away from that half of the right of way farthest from the river, thus eliminating all maintenance expense upon that part of the right of way, but that the amount of water thrown against the company's right of way on the other side of the levee will be doubled, and, because of higher water or faster flow, or both, the cost of maintaining trestles and embankments in that half will be double, the result will be that, although less expense is required on one-half, more is required on the other because of the construc-

tion of the levee, and that no saving, in fact, will result to the railroad, and therefore it is not benefited. Or, to illustrate again: If the location of a drainage ditch or waterway is changed by statutory proceeding, a railroad is required at its own expense and without compensation to construct a bridge across the new channel. This, of course, would make it possible for the railroad to remove the bridge over the old channel and save the expense of maintaining the old bridge; but, upon the other hand, it would be burdened with the maintenance of the new bridge, to say nothing of the cost of the new structure. If the maintenance of the old and new bridges were equal, it could not be said that the change had worked any saving for the railroad, and, consequently, it could not be said to be benefited upon that score. In other words, the construction of the levee cannot be said to benefit the railroads to the full extent of any saving in maintenance that is accomplished on that portion of their right of way outside the levee, if some of the saving is accomplished at the expense of a greater burden of maintenance which the construction of the levee enforces upon the railroad on that part of its right of way between the levee and the river, and this latter additional expense should have been taken into consideration by the court in determining the assessable benefits.        •

A different question is involved in determining whether any expense incident to raising the railroad tracks and embankments in order to cross the levee at grade, or in raising or widening its bridge in order to permit the safe crossing of the stream, should be taken into consideration upon the question of benefits. It is pointed out in *State ex rel. St. Paul M. & M. R. Co.* v. *District Court of Hennepin Co.* (1889), 42 Minn. 247, 44 N. W. 7, 7 L. R. A. 121,

that a distinction is to be made between rights of property which are protected under the Constitution from being divested or appropriated to other purposes without compensation, and the very different matter concerning the manner in which an owner may use his property as against the interest of the public. When the railroads' franchises were granted, it was contemplated that they were conditioned that public enterprises, such as highways, drains, or levees, might cross the right of way, and that the railroads would ever maintain their rights of way, so as not to interfere with such structures, at their own expense. There is no taking of the railroad's property when it is required to meet the condition under which its franchise was granted, and change or destroy its structures, or erect new ones, to meet the changed conditions, notwithstanding great expense may be involved. This affects only the manner in which the railroad may use its property when the use conflicts with the interest of the public. But where the railroad is required to contribute to the cost of the enterprise, there is a taking of its property, which, under the Constitution, cannot be appropriated without compensation. This compensation may consist of benefits accruing to the railroad, but unless special benefits actually accrue there can be no assessment.

It is conceded by the appellees that the appellant railroads will be put to some expense at least in conforming their tracks and structures to the new conditions brought about by the construction of the levee, but they contend that, in so far as they are damaged or injured thereby, it is *damnum absque injuria*. It is clear that the railroads will be put to a considerable expense. They offered to prove that the changed conditions will require the raising of their

bridges and tracks, and that to restore them to the present margin of safety will involve an expense of almost $1,000,000, or almost as much as the cost of the entire improvement. The term *"damnum absque injuria"* means a damage without *legal* injury. No one, legally speaking, is injured or damnified unless some *right* is infringed. The refusal or discontinuance of a favor gives no cause of action. Sedgwick on Damages (9th ed.), pp. 28, 29, §32; *Paul* v. *Slason* (1850), 22 Vt. 231, 54 Am. Dec. 75.

It is not because there is no injury or damage inflicted that damages cannot be recovered, but because no legal right has been invaded. As has been pointed out, the railroad accepted its franchise subject to the implied understanding that it would suffer such damage as might be involved in reconstructing its plant to meet changed conditions. But it does not follow that, because there is no right infringed, and therefore no legal injury for which there can be a recovery in an action, the construction of the work will not injuriously affect the railroads or that they will be benefited by the project. Judge Cooley has said that the best measure for the determination of benefits or damages to property by public improvements is the effect upon market value, and this method is generally resorted to as furnishing at least evidence of benefit or damage. There are certain instances referred to in the cases where market value is not a safe or possible guide, but this is because of exceptional circumstances. In any event it may be safely said that property is damaged when it is made less valuable, less useful, or less desirable, and that it is benefited when it is made more valuable, more useful, or more desirable.

It seems that the tracks, embankments, and bridges

of the railroads here involved are reasonably efficient for the purpose for which they were designed, ▆ and that at the cost of some maintenance they serve the purpose for which they were intended. If, upon the expenditure of many hundreds of thousands of dollars made necessary by the construction of the levee, they serve no better purpose and require substantially the same amount of maintenance expense, and the earning power of the railroads is not substantially increased thereby, the value of the railroads in their entirety has become less, since their earnings must be divided to compensate for the additional capital required for the new construction work. It seems clear therefore that, while the railroads may not recover the damage incurred in conforming to the new work, they cannot be said to be benefited so they may be assessed to assist in its construction unless the benefits on the whole exceed their necessary outlay in changing their property.

The cases above cited which hold that if the effect of the construction of a drain was to reduce the volume of water and to permit the railroad to maintain a smaller bridge or opening, or to obviate the necessity of an additional bridge, may be the basis of the assessment of a benefit, furnish support for the contention that if, upon the other hand, the construction of the drain increased the volume of water and required the railroad to maintain a larger bridge or opening, or necessitated an additional bridge, this should be taken into consideration in determining whether upon the whole there is a benefit.

The case was tried and the benefits assessed to the appellant railroads upon the theory that benefits found were not to be minimized through a consideration of

the cost of conforming to the improvement. This was error.

It appears that the petitioners in this proceeding, by oral contract, employed attorneys to represent them. At the time they were employed, and at the inception of the proceeding, section 9576, Burns 1926, §27-804, Burns 1933, made this provision: "The superintendent of construction charged with the execution of the work, out of the funds collected from the assessments made and confirmed as provided in the last section, shall pay all cost of the work not otherwise adjudged, and all the expenses incident to the construction of the work, including the reasonable attorney's fees of the petitioners in the preparation and presentation of the petition, the establishment of the work and other services rendered in such work, and shall also pay such other costs and expenses as the court shall deem proper: . . ."

During the trial, and before judgment, a statute was enacted, in force March 9, 1923, entitled "An Act fixing attorney's fees in proceedings for the construction, reconstruction and repair of ditches and levees." Acts 1923, ch. 183, pp. 537, 538. The first section of the act is as follows: "Section 1. Be it enacted by the General Assembly of the State of Indiana, That hereafter the amount of fees paid to the attorney or attorneys for the petitioner or petitioners in any proceeding for the establishment, construction, reconstruction or repair of any ditch, drain, levee, dike or break water shall not exceed, in the aggregate, an amount equal to one per cent. of the total cost of construction, reconstruction or repair of such work: Provided, That the provisions of this act shall not apply in any case where the total cost of construction, reconstruction or repair of such work is twenty thousand dollars ($20,000.00)

or less: Provided, further, That the court may allow, in addition to the one per cent. hereinabove provided for, such additional sums, not in excess of four per cent. of such estimated cost up to twenty thousand dollars ($20,000), as to the court may seem just and proper." After the passage of this act, and upon final judgment, the court allowed the petitioners' attorneys $50,000 for their services, which is more than is permitted under the latter act. The right of petitioners to recover attorney's fees did not exist at common law, but is dependent upon the grace or favor of the statute. The latter act must be construed as limiting the former and they must be read together. The amount of fees to be allowed had not been fixed at the time the latter statute was enacted, and no right had vested. The latter act had the same effect as a repeal of the former act, in so far as it authorized allowances in excess of those provided for in the latter. It is clear and well established that, if the legislature had repealed the entire levee statute at the time the trial was in progress, all right to a judgment establishing the work would have been lost. *Taylor* v. *Strayer et al.* (1906), 167 Ind. 23, 78 N. E. 236. The fact that great hardships may result cannot have the effect of limiting the legislative power to repeal or modify. The court had no power to allow attorney's fees in excess of the amount prescribed in the latter statute. It is contended by appellees that the word "hereafter" indicates that the latter act is intended to apply to proceedings instituted after its passage. But, as we see it, the word refers to the payment of fees, and not to the institution of proceedings. It is also contended that the title of the act embraces only fees in proceedings for the construction, reconstruction, and repair of ditches and levees, and makes no mention of fees for the establishment of

ditches and levees. But it will be noted that the title of the act refers to fees in *proceedings* for the construction, reconstruction, and repair of ditches and levees, and not fees for the *construction, reconstruction,* and *repair.* Ditches and levees can only be established under the *proceedings* referred to.

Appellees also contend that the fees allowed are not costs, but are compensation for services rendered by virtue of a contract. It is clear, however, that the petitioners had no power to fix the amount of compensation that would be paid their attorneys. They had the right to employ attorneys, and thus, by contract, determine who should receive any fees that might be allowed; but petitioners had no power to burden the area to be taxed with any specific amount of expense incident to attorney's services. The right to receive such reasonable amount as the court should fix arose through the statute. If the statute had been repealed entirely before an allowance was made under it, the court would have had no power to make any allowance by way of attorney's fees. But the statute was not repealed; it was merely modified, and the amount which the court might in its discretion allow was limited. The court and the appellees are bound by the limitation.

The improvement proposed includes two pumping stations operated by large power pumps. The levee act permits the levy of an annual tax not exceeding 5 per cent. of the assessed benefits for maintenance and operation. There was evidence indicating that the pumps would have to be operated from thirty to ninety days each year, involving an expense for labor, fuel, etc., and that the levee would have to be patrolled and kept in repair at an expense which appellants claim would be about $1.00 per acre for each year, or $60,000

680

per annum. It is their contention that this amount should be capitalized and $1,000,000 added to the cost of the project. We cannot concur in this view. It is, however, obvious that liability to pay an annual special tax in any amount per acre is a burden on land which directly affects its market value and its earning power, and the liability to pay special taxes for the operation and maintenance of the levee should have been taken into consideration in determining the amount of benefits to affected property.

What we have said disposes of the substantial questions presented. The multitude of questions saved and errors assigned all relate, directly or indirectly, to these questions. An application of the principles announced will dispose of the incidental questions should they arise upon another trial, and no good purpose can be served by further extending this opinion.

For the errors pointed out, the judgment is reversed, with instructions to sustain the motions of the appellants for a new trial, and for further proceedings not inconsistent with this opinion.